RIGGS NATIONAL BANK OF WASHINGTON, D.C., Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

DISTRICT OF COLUMBIA, Cross–Appellant,

v.

RIGGS NATIONAL BANK OF WASHINGTON, D.C., Cross–Appellee.

Nos. 88–1016, 88–1129 and 88–1150.

District of Columbia Court of Appeals.

Argued March 2, 1990.
Decided Oct. 26, 1990.

Steven M. Umin, with whom Jefferson M. Gray, Washington, D.C., was on the brief, for appellant/cross-appellee Riggs Nat. Bank.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellee/cross-appellant District of Columbia.

Brice M. Clagett and Steven G. Bradbury, Washington, D.C., filed a brief for Washington Area Bankers Ass'n, as amicus curiae.

Before TERRY, SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Remarkable as it may seem to those who must make ends meet and worry about the next mortgage payment and the price of widgets, there are actually people who neglect to cash cashier's checks. Others leave savings and checking accounts dormant at the bank. What happens to such funds when they are not claimed by their rightful owners? This case requires us to interpret for the first time various provisions of the Uniform Disposition of Unclaimed Property Act (hereinafter "the UPA" or the Act), D.C.Code §§ 42-201 to -242 (1990), which addresses that very question and attempts to resolve it in a manner favorable to the beleaguered taxpayers of our beautiful but financially strapped capital city.

The property at issue, which has a value of approximately $1.7 million, consists of

dormant deposits which have no known owners or which belong to non-residents of the District, as well as funds deposited by customers to cover official checks which have not been presented for payment.[1] Appellant Riggs National Bank of Washington, D.C. (Riggs) holds certain funds alleged by the District of Columbia to be subject to the provisions of the Act and has declined to report and deliver them to the District despite a demand that Riggs do so. Following that refusal, the District filed this action in the Superior Court and prayed for an order directing Riggs to report and deliver the property and to pay pre-judgment interest and civil penalties. Riggs maintained below, and now contends in this court, that the disputed funds are not subject to the provisions of the Act.[2]

Following a hearing on cross-motions for summary judgment, the trial judge held that the UPA requires Riggs to report and deliver all of the disputed funds to the District. The judge denied the District's request for pre-judgment interest and civil penalties. Both sides have appealed. We affirm in part, reverse in part, and remand the case for further proceedings.

## I

### THE DISPUTE

The basic facts are not in dispute. Following an audit authorized by Section 42–234(c)(1),[3] the District advised Riggs that Riggs was in possession of unclaimed property worth approximately 2.2 million dollars subject to reporting and delivery pursuant to the UPA. Riggs delivered a portion of the unclaimed property to the District, but withheld three categories of funds worth approximately 1.7 million dollars.[4]

The first disputed category of assets has a value of approximately $880,000. It consists of roughly $780,000 in stale official checks issued by Riggs which have never been presented for payment, and approximately $100,000 in miscellaneous dormant funds belonging to unknown depositors. In the 1970's, before the UPA was enacted, Riggs closed out long-dormant items, converted them on its books to income, and used the money as its own.[5] Riggs contends that it has commingled these funds with its other assets and has paid taxes on them. Nevertheless, as a matter of good public relations, Riggs "absolutely" honors any occasional stale official check that may be presented for payment, and would not resist any attempt by the owner of a dormant deposit account to withdraw funds from it.

The second disputed group of funds consists of approximately $665,000 in unclaimed accounts which were deposited with Riggs by persons who do not live in the District. At the time this litigation began, the District had reciprocity agree-

---

**1.** Official checks are cashier's checks, certified checks, money orders and other instruments on which Riggs National Bank is directly obligated.

**2.** Riggs also impleaded the State of Maryland, which argued that it rather than the District was entitled to receive $204,000 in unclaimed funds deposited with Riggs by Maryland residents. The trial court resolved this issue in favor of the District. The State of Maryland has not appealed from the trial court's decision and its claims are not before us.

**3.** For the convenience of the reader, we cite the provisions of the UPA as codified rather than by section number in the statute. Unless otherwise specified, D.C.Code citations are to the 1990 edition.

**4.** The exact dollar figure of the amount in controversy cannot be determined because interest continues to accrue on the affected funds and because, during the pendency of this litigation, several of the owners of abandoned funds have presented claims for payment which have been honored by Riggs.

**5.** Between 1971 and 1974, dormant savings accounts having no identifiable depositor or owner, as well as any funds earmarked for payment of official checks issued before 1966 with a face value of less than $100, were transferred into income and commingled with Riggs' other assets. Beginning in 1975, Riggs modified the above-described policy and began treating as income all funds which had been unclaimed for ten years or longer. The following year, this policy was again revised and made applicable to all funds which had remained unclaimed for five years.

ments with eleven states [6] for the mutual exchange of abandoned property. *See* § 42–234. Riggs reported and delivered to the District all unclaimed property abandoned by any person whose last known address was in one of the eleven "reciprocity" States. The bank refused, however, to deliver abandoned funds deposited by anyone whose last known address was in one of the "non-reciprocity" States, including Maryland. Riggs acknowledges that it has no legal right to retain these funds for its own use and has not transferred them on its books to income. Riggs maintains, however, that before it can be required to deliver the property to the District pursuant to the Act, the District must satisfy a statutory condition precedent, namely that the non-reciprocity State does not have a superior claim to the funds. Riggs contends that no such showing has been made, and that if the condition precedent is not enforced, Riggs could be subject to multiple liability.

The third issue between the parties relates to service charges on inactive accounts. In March 1980, Riggs adopted a policy of imposing a semi-annual charge of eight dollars on each account under $50 which had remained dormant for a minimum of three years. During the next two years, Riggs collected a total of more than $117,000.[7] These collections completely depleted the funds in a number of the accounts. The District alleges that the imposition of these charges violated the UPA, and seeks to recover the amounts charged, as well as over $27,000 in additional interest which would have accrued on the affected accounts if Riggs had not imposed the disputed service charges.

**6.** These states are Florida, Idaho, Illinois, Maine, Massachusetts, Minnesota, Nevada, North Carolina, Rhode Island, Virginia and Wisconsin.

**7.** Riggs abandoned this policy in April 1982.

**8.** Fifteen of the seventeen national banks in the District by themselves have over $25 million in accounts which have been inactive for seven years or more.... Four major District savings and loan associations reportedly had between nine and twenty-six million dollars in dormant accounts at the end of 1978....

II

THE STATUTE

■ Before the enactment of the UPA, depositary institutions in the District of Columbia enjoyed the use of, and often appropriated as their own, many millions of dollars in unclaimed deposits, stale official checks and other unclaimed property under a process which the trial judge in this case aptly described as a "private escheat." In 1981, concluding that this state of affairs provided a "windfall" for these institutions, COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE OF THE JUDICIARY, REPORT ON BILL NO. 3–267, UNIFORM DISPOSITION OF UNCLAIMED PROPERTY ACT OF 1980 (hereinafter COMMITTEE REPORT) at 2, the Council of the District of Columbia enacted legislation designed to put an end to the unearned and fortuitous enrichment of the holders of abandoned property and to provide instead for the interests of the citizens of the District and ensure that any such escheat would be for public benefit rather than for private gain.[8] In the first section of the Act, the Council stated that the purpose of the UPA was to

mandate the report and delivery by holders and to authorize the receipt for safekeeping and fiscal growth by the District of Columbia of any and all personal property which is abandoned, without regard either to any maximum length of time for which such property was abandoned or to any statute limiting the right to sue to claim such property.

§ 42–201.

The sweeping language of this opening statutory salvo, which would embrace funds abandoned on the first day Riggs

One effect of holders possessing such property ... is that the holders are obliged to maintain it in perpetuity and may be exposed to multiple liability.... Another effect of such sizeable unclaimed holdings is the loss of its usefulness to the actual owners or to the government as conservator for the owners.

\* \* \* \* \* \*

[This] bill is intended to improve the equities in the above-described situation.
COMMITTEE REPORT at 2–3.

went into the banking business, bespeaks a remedial enactment designed to correct what the Council plainly viewed as an unjust status quo. The trial judge recognized, and so do we, that courts are obligated to accord a generous construction to legislation of this kind. "Remedial statutes are liberally construed to suppress the evil and advance the remedy." 3 N. SINGER, SUTHERLAND, STATUTORY CONSTRUCTION § 60.01, at 55 (4th ed. 1986) (hereinafter SUTHERLAND); *Tenants of 738 Longfellow St., N.W. v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 1205, 1211 (D.C. 1990).

Although its prime purpose was the one identified in the statutory declaration which we have quoted above, the UPA was also designed to protect the interests and rights of the true owners of abandoned property and to relieve holders of such property, such as banks, of the annoyance, administrative expense and liability incident to caring for it. COMMITTEE REPORT, *supra,* at 2. Property subject to the Act does not escheat to the District upon delivery. Rather, the District acts as a "conservator" and "assumes custody and responsibility for the safekeeping of the property" until the true owner makes a claim. §§ 42–201, –220; 9 DCMR § 3000.6 (1986).

The UPA requires private holders to report and deliver to the District all property which is "presumed abandoned." §§ 42–203, –217. The circumstances which give rise to a presumption of abandonment differ depending on the type of unclaimed property. *See* §§ 42–206 through –216. In general, property is presumed to be abandoned if it has remained unclaimed for a specified time period. With respect to the funds at issue in this case, that period is ten years. *See* § 42–206(a) and (d), discussed at page 1235, *infra.*

Abandoned accounts may have significant connections with more than one jurisdiction, and the Supreme Court has considered the question of priorities between

state-claimants. *See Texas v. New Jersey,* 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965). Contemplating the possibility of such competing claims, the UPA has created certain "conditions precedent" to the presumption of abandonment. § 42–204. These conditions precedent are discussed in some detail at pages 1243–1248, *infra,* for they are central to one of the major issues disputed by the parties.

Finally, the UPA deals with abandoned property no matter how long ago it was abandoned and regardless of the applicability of any statute of limitations. *See* Section 42–201, quoted at pages 1233–1234, *supra.* Given this potential reach a long way back in time, one of the major issues which arose during the legislative consideration of the UPA was the extent, if any, to which the statute should apply retroactively to funds abandoned a great many years ago. In this regard, the Council sought to accommodate not only the remedial goals of the Act but also the legitimate expectations of the depositary institutions. The final section of the Act provides that

> [t]his chapter shall apply retroactively to all items of property which would have been presumed abandoned if this chapter had been in effect as of January 1, 1980.[9]

§ 42–242. Counsel and the trial judge have suggested different interpretations of this provision, which is not as simple as it seems at first blush to be, and we begin our analysis with a consideration of their respective views.

### III

### THE RETROACTIVITY ISSUE

 Joined by the Washington Area Bankers Association (WABA) as *amicus curiae,* Riggs contends that the UPA, which became effective on March 5, 1981, was intended to apply only to those funds which it was still treating as abandoned property on its books as of January 1, 1980. Riggs says that those obligations on offi-

---

9. January 1, 1980 was selected because "(1) it is a notable turning of a decade and thus easily used as a time marker and (2) it approximates a time when the public was put on notice that the

government was contemplating recouping unclaimed property...." COMMITTEE REPORT, *supra,* at 40–41.

cial checks and those dormant accounts which it had closed and converted into income prior to that date are not subject to the Act and need not be reported or delivered to the District. Riggs so argues even though the existence and precise amount of these funds was capable of being determined as of January 1, 1980, and in spite of the fact that Riggs routinely honors demands for payment by the holders of such checks and by the original owners of these accounts.

The trial judge ruled that the District's rights under the UPA did not depend on how the disputed funds were carried on the bank's books. He held that all funds identifiable as of January 1, 1980 as having been unclaimed for the requisite period were subject to reporting and delivery whether or not the bank had transferred them to income. We agree with the trial judge.

## A. The Statutory Language.

"In interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning." *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 45 (D.C.1989) (citations omitted). "The words used [in the statute], even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing." *Id.* at 46 (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (per Learned Hand, J.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). Although "it is one of the surest indexes of a mature and devel-

oped jurisprudence not to make a fortress out of the dictionary," *Parreco, supra*, 567 A.2d at 46 (quoting *Cabell, supra*, 148 F.2d at 739), it is useful to have one around.

Section 42–242 applies retroactively to all property which would have been "presumed abandoned" if this chapter had been in effect on January 1, 1980. The words "presumed abandoned" do not lack statutory definition. Dormant bank deposits and unclaimed official checks are presumed abandoned if the owner has taken no meaningful action with respect to them, or otherwise shown interest in them for a period of ten years. *See* § 42–206(a) (bank deposits), § 42–206(d) (official checks). It is undisputed that the requisite decade of inactivity had elapsed with respect to the disputed deposits and official checks. Moreover, Riggs' general ledger contained an inventory of "stale-dated" official bank checks, with all important data included; the deposits were likewise readily identifiable.

There is nothing in the language of the statute which suggests that the presumption that such dormant deposits and unclaimed official checks have been abandoned is affected in any way either by the date when the bank received them or by the manner in which they are carried on the bank's books.[10] The trial judge expressed the view that the statute "makes perfectly clear what the status of those funds should be," namely, that they were covered. Although clarity in statutes is often in the eye of the beholder and perfection a rare commodity indeed, we agree that the most reasonable construction of the words "presumed abandoned" is that the disputed funds fall within them.

---

**10.** Section 42–203, which deals with intangible personal property "not otherwise covered by the chapter" (and thus is not by its terms applicable to bank deposits and official checks) provides that such property is presumed abandoned if it is *"held or owing in the ordinary course of the holder's business* and has remained unclaimed by the owner for more than 7 years ..." (Emphasis added). Although the italicized language is not included in Section 42–206(a) and (d), we think it reasonable to suppose that the "ordinary course of business" concept was intended to apply to bank deposits and officials checks as well.

As of January 1, 1980, however, Riggs undoubtedly "held" the funds in question; it had

them neatly catalogued and was able to establish the precise value of each. The funds were "owing," at least in the sense that Riggs does not deny that it routinely, *i.e.* in the ordinary course of business, paid them to the owner upon demand; indeed, it is undisputed that this was the common practice among banking institutions. See pages 1243–1244 note 23, *infra*. Accordingly, Section 42–203 cannot be construed as excluding from the reach of the UPA property otherwise subject to its provisions simply because that property has purportedly been converted into "income" on the bank's books.

"Presumed abandoned", however, are not the only words that appear in Section 42–242. That section provides that the Act shall "apply *retroactively*" to items which would have been presumed abandoned on January 1, 1980. The word "retroactively" was surely inserted into the statute for a reason; the section adds something which would not otherwise be there. The inclusion of this adverb suggests, at least, that something was being covered retroactively that would otherwise not have been reached; in other words, but for the existence of Section 42–242, some funds potentially subject to the Act in 1980 would no longer have been covered in 1981. It is Riggs' theory that the effect of Section 42–242 was to render any conversion of dormant funds into income on the bank's books after January 1, 1980 ineffective to defeat the reach of the Act, but that any such conversion prior to that date effectively changed what was previously "abandoned property" into Riggs' property, which was now commingled with other assets and therefore non-existent as a separate entity for purposes of the Act. If funds received in prior years were "converted to income" during the 1970's, according to Riggs and WABA, they are not subject to the UPA.

In support of the contention that the disputed property was no longer "presumed abandoned," Riggs and WABA rely heavily on the legislative history of the retroactivity provision. Section 13(g) of an earlier (but never enacted) version of the UPA, introduced by then Council Chairman Arrington Dixon, would have provided that

[t]he initial report filed under this act shall include all items of property that would have been presumed abandoned if this act had been in effect *during the ten-year period preceding its effective date.*

(Emphasis added). Representatives of the banking community were troubled by this provision, and expressed their concerns to Councilman David Clarke, who was then Chairman of the Council's Committee on the Judiciary. On August 12, 1980, Mr. Clarke advised the banking representatives that "the latest print of the bill has been revised to incorporate the constructive suggested changes made by the interested commentators." Apparently as a result of the contacts to which Chairman Clarke was alluding, Section 13(g) of the Dixon bill was replaced by Section 42–242 of the UPA as enacted. A retroactivity period of fourteen months was thus substituted for the contemplated ten-year period in the earlier version.

Riggs and WABA contend that the trial court's construction of Section 42–242 renders meaningless the Council's substantial reduction of the period of retroactivity originally proposed by Chairman Dixon. According to WABA,

[u]nder the [trial] court's reasoning, the statute would have precisely the same effect even if it did *not* contain Section 242, or if the date in that section had been January 1, 1920, January 1, 1880, or any other date one might pick. On the court's theory, Section 242 and the date it specifies add nothing and change nothing. So far from being dictated by Section 242, the court's ruling renders Section 242 meaningless.

Statutory provisions must be presumed to have been enacted for a purpose. *District of Columbia v. Acme Reporting Co.*, 530 A.2d 708, 713 (D.C.1987).... That Section [42–]242 was intended to have a purpose is emphasized by the significant attention that the issue of retroactivity received during the legislative process. As originally introduced, the draft Act contained a 10–year retroactivity provision. As a result of concerns expressed by the banks, this was shortened to a little over one year, as provided in the present Section [42–]242.

[WABA brief at 7; emphasis in original].

Riggs and WABA also invite our attention to the discussion of Section 42–242 in the report of the Judiciary Committee. The Committee stated that under the terms of that Section,

there is no need to reconstruct bank accounts, for example, prior to [January 1, 1980]. Extremely old abandoned accounts would be reportable and delivera-

ble *in the amount they were in* on January 1, 1980.

COMMITTEE REPORT, *supra,* at 40 (emphasis added). According to Riggs and WABA, this means that old accounts which had been closed out by Riggs and transferred to income are not covered by the Act, because they did not exist on January 1, 1980, and "the amount they were in" was therefore zero.

We cannot say that these arguments are wholly implausible. Nevertheless, we reject them for two primary reasons. First, if the Council had meant what the bank and bankers now say it meant, it surely could have said so. Second, we are not prepared to believe that a legislature with broad and sweeping reform on its mind, which boldly described its purpose as being to require the reporting and delivery to the District of "any and all" property abandoned since the beginning of time, could have intended to make coverage dependent on the manner in which a bank characterized relevant property on its books.

According to WABA, "the banks' concern was that the Act not reach property that had been taken into income in the past, and that the [Dixon] bill before the Council was amended to meet that concern."[11] WABA brief at 9. If that is true, then it would surely not have been difficult for the representatives of the banking community to devise, or for the Council to adopt, statutory language that clearly effected such an intention, or at least conveyed to the reader that this is what the legislature probably intended. *See Superior Beverages, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 567 A.2d 1319, 1323 (D.C. 1989) ("[s]uch a policy would not be difficult to articulate forthrightly, clearly, and directly"). Given the broad sweep of the

overture to our statutory opera, which spells out coverage of all abandoned funds regardless of the date of abandonment or the expiration of any limitation period, and in light of the Council's obvious concern about windfalls and the equities, one would expect that if the final chorus were designed to defer or attenuate the demise of such windfalls, it would be cast in no uncertain terms, so that a reviewing court could not miss the striking change in tone and direction.

Second, Riggs and WABA ascribe to the Council an intention to allow coverage to turn not on reality but on the bank's paper treatment of reality. Under the interpretation of Section 42–242 for which it argues, Riggs, which transferred the affected funds to income prior to January 1, 1980, would be protected from the requirements of the Act. A bank which had kept the old accounts alive on its books a little longer, however, would be required to deliver them to the District. This result would obtain even where the relevant information was equally available with respect to both institutions, so that there was no need to reconstruct or recompute old accounts. We might be persuaded that this was the rule which the Council intended to enact if it had said so plainly, but it did not.

B. *The Trial Judge's Decision.*

Contrary to WABA's contention that under the trial judge's interpretation of Section 42–242, January 1, 1980 might as well have been January 1, 1880 or any date in between, see pages [1234–1235], *supra,* we think the judge recognized that the Council had taken meaningful action when it rejected Section 13(g) of the Dixon bill and then adopted Section 42–242 as it now reads, and that he gave the section as a whole,

---

**11.** This statement is based on the deposition testimony of Mr. Maurice J. Cullinane, the Vice President of the predecessor of WABA, who had extensive dealings with the Council while the UPA was under consideration. Riggs and WABA also rely on a letter written by Chairman Clarke in July 1987, six and a half years after the enactment of the UPA.

We do not think that our construction of a statute should be based in any significant measure on the views expressed after the fact either

by one legislator or by a representative of the regulated industry. Such *"post hoc* statements of a congressional Committee are not entitled to much weight." *Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1518, 71 L.Ed.2d 715 (1982) (citation omitted). The same is surely true, *a fortiori,* with respect to after-the-fact statements by a single Councilman and, especially, by a spokesman for an industry whose economic interest was adversely affected by the Act.

and the selection of January 1, 1980 in particular, a significant effect. The judge held that the retroactivity provision as enacted did not eliminate the obligation of local banks to report and deliver "any and all personal property which is abandoned," as required by Section 42–201. Rather, it affected only the amount of money which the District is entitled to recover. The Dixon version, as the judge viewed it, would have required banks to report and deliver to the District all abandoned accounts in the amounts which they "were in" ten years preceding the enactment of the UPA.

As a result, the banks would have been obliged to go back at least ten years, see note 16, *infra*, credit deducted service charges, apply accrued interest, and re-create old balances. A survey of dormant accounts in national banks of the District of Columbia, relied on by the Council, showed that between 1974 and 1979 an average of nearly $150,000 in annual service charges had been imposed on dormant savings and demand accounts. Under section 42–242 as enacted, the banks were forgiven these charges and spared the laborious task of re-computing old balances.

We think that the judge's view finds support in the relationship between Sections 42–206 and 42–242 of the UPA. Section 42–206(e) prohibits the imposition by banks of service charges on dormant accounts unless certain enumerated criteria are satisfied. See discussion at pages 1248–1252, *infra*. Specifically, Section 42–206(e)(3) requires that, for dormant accounts containing more than ten dollars, the bank must provide the owner with notice that a service charge has been deducted. Section 42–206(e)(3) states, however, that

notice provided in this section need not be given with respect to charges imposed

or accrued or interest ceased *prior to January 1, 1980.*

(Emphasis added). According to the Judiciary Committee,

[s]ubsection (e) read in conjunction with section [242] of this bill has *prospective effect from January 1, 1980. That is, service charges levied before January 1, 1980 need not be reported or delivered to the Mayor.*

COMMITTEE REPORT, *supra*, at 16 (emphasis added). The Committee also observed that Section 42–242 does not require holders to "reconstruct" extremely old abandoned bank accounts because such accounts would be reportable in "the *amount* they were in" as of January 1, 1980. *Id.* at 40. In other words, old abandoned accounts are subject to reporting and delivery, and the cut-off date of January 1, 1980 serves as the date as of which their value is to be assessed. In light of the Committee's allusion to such old accounts as being reportable in some amount, the Act obviously reaches property that came into Riggs' possession prior to January 1, 1980.

We are of the opinion that the judge's reading of Section 42–242 as not affecting the duty to report and deliver the disputed funds, but only the amounts in which they must be reported and delivered, is more in keeping than Riggs' construction with the language of the Act, with its remedial character, and with the somewhat "Delphic" discussion [12] of the subject in the COMMITTEE REPORT.

## C. The Statute of Limitations.

Riggs contends that even if Section 42–242 is construed as sustaining coverage with respect to property which had been transferred to income prior to January 1, 1980, the Act may not lawfully operate to revive claims that were barred by the statute of limitations prior to the enactment of the UPA.[13] This contention is predicated

12. This characterization is taken from the District's brief.

13. Riggs acknowledges that the statute of limitations has not begun to run with respect to the dormant deposits, since a demand for payment is required to begin the running of the statute and no such demand has been made by the

owner. Riggs asserts that the title to those deposits has passed to Riggs by abandonment and seeks to apply the statute of limitations defense to the official checks. The District claims that the statute of limitations has not begun to run either on the dormant deposits or on the official checks, but acknowledges that

both on statutory and on constitutional grounds. Relying on Section 42–241, which provides that the Act shall be construed to "effectuate its general purpose to make uniform the law with respect to the subject of this chapter among those states enacting it," Riggs cites decisions from California, Illinois and Alabama holding that, in the absence of a clear expression to the contrary, the UPA should not be construed to apply to property as to which the limitations period expired prior to its enactment. Riggs also claims that the trial judge's construction of the Act deprives it of property without due process of law.

(1) Uniformity of construction.

██ In support of its uniformity argument, Riggs relies on *Douglas Aircraft Co. v. Cranston,* 58 Cal.2d 462, 374 P.2d 819, 24 Cal.Rptr. 851 (1962) (en banc) (per Traynor, J.) and three later decisions which have adopted the reasoning of that case and reached the same result.[14] In *Douglas,* the court was construing a statute which, like Section 42–229(a) in our own Act, provided that the expiration of the statute of limitations "shall not prevent the money or property from being presumed abandoned property" or affect the holder's duty to report or deliver it. Rejecting the contrary claim of the State Controller, the court held that

[t]his section does not expressly provide that it shall be retroactive or apply to claims that were already barred when it was enacted. Accordingly, under section

3 of the code [15] . . . it must be interpreted as applying only to claims on which the statute of limitations had not run on the effective date of the Act,

*Id.* at 466, 374 P.2d at 822, 24 Cal.Rptr. at 854.

We would have no reluctance in following Judge Traynor's characteristically well-reasoned opinion if our own statutory framework were the same as that in California, Illinois and Alabama, but it is not. Aside from Section 42–229, which is substantially identical to the California provision construed in *Douglas* (and to comparable provisions in Illinois and Alabama), our Section 42–201 provides that the District's UPA applies to

any and *all* personal property which is abandoned, *without regard to any maximum length of time for which such property was abandoned* or to any statute [of limitations].

(Emphasis added). The italicized language, as we have noted, means that "the bill properly reaches back to authorize transfer to the District of *all* mentioned property which has been unclaimed for the defined minimum number of years or longer." COMMITTEE REPORT, *supra,* at 10 (emphasis added). By its terms, Section 42–201 embraces property abandoned for a hundred years, and the statute of limitations expired on such property a very long time ago. Accordingly, we think that the express provision found lacking in *Douglas* is present here.[16]

---

there is contrary case authority with respect to the latter. We need not decide the question whether the statute of limitations is applicable to official checks because we conclude, even assuming that Riggs is correct, that neither the statute of limitations nor the common law of abandonment protects the bank from the duty to report and deliver the affected funds.

**14.** These decisions are *Citronelle–Mobile Gathering, Inc. v. Boswell,* 341 So.2d 933, 937 (1977); *Boswell v. South Cent. Bell Tel. Co.,* 293 Ala. 189, 190, 301 So.2d 65, 67 (1974); *County Mut. Ins. Co. v. Knight,* 40 Ill.2d 423, 428, 240 N.E.2d 612, 615 (1968).

**15.** This reference is to Section 3 of the California Code of Civil Procedure, providing that "[n]o part of [the statute of limitations] is retroactive unless expressly so declared." We have

not been cited to any comparable provision in the District.

**16.** The sweeping terms of Section 42–201 also distinguish our statute from the 1954 Uniform Act. Section 16 of that Act, which is virtually identical to Section 13(g) of the Dixon bill, reaches property "which would have been presumed abandoned if this Act had been in effect during the 10–year period preceding its effective date." According to one commentary, this provision means (assuming an effective date of March 1, 1982) that the Act can be construed either

(1) to reach back ten years and apply to all property coming into the holder's possession since March 1, 1972 [or] (2) to reach back ten years plus the seven-year abandonment period and thus apply to all property coming into the holder's possession since March 1, 1965.

The Judiciary Committee was aware of the *Douglas* case and of the *Knight* [17] decision in which the Supreme Court of Illinois followed *Douglas;* both cases are cited in the legislative history. *Id.* at 31. Immediately after that discussion, the Report continues:

> Even where the statute of limitations has run on the property prior to the effective date of the act, if the holder does not enforce the statute against the owner it must report and deliver the property to the state. *See South Carolina Tax Commission v. Metropolitan Life Insurance Co.*, 266 S.C. 34, 221 S.E.2d 522 (1975).

*Id.* The Report then refers the reader back to the earlier discussion of the reach of the Act:

> Section 101 also makes clear that holders are required to report and deliver such property to the Mayor without regard to the District's statute of limitations (D.C. Code sec. 12–301) lest there be any confusion in that regard.

*Id.* at 10.

With a statute that by its terms covers property abandoned for a century or a millennium, legislative history which at least arguably rejects the applicability of the *Douglas* line of cases, and a bank which does not enforce the statute against original owners,[18] we do not believe that Riggs' plea for uniformity of interpretation can prevail; dissimilar statutes are not to be similarly construed.

**(2) Constitutionality.**

■ Riggs contends that the UPA, as construed by the trial judge, deprives it of property without due process of law in violation of the Fifth Amendment. WABA has added two refinements. First, it says that application of the statute to funds with respect to which the statute of limitations had expired prior to its enactment constitutes a taking of Riggs' property for public use without just compensation. Second, citing *United States v. Security Indus. Bank*, 459 U.S. 70, 79–82, 103 S.Ct. 407, 412–15, 74 L.Ed.2d 235 (1982), WABA contends that Section 42–242 should be construed in such a way as to avoid creating what WABA describes as a serious constitutional problem; Riggs joins in this claim. We find all of these constitutional and related contentions to be unpersuasive.

This court recently reiterated its disposition to refrain from striking down allegedly unwise legislation in the absence of a clear conflict with the language of the Constitution. *Hornstein v. Barry*, 560 A.2d 530 (D.C.1989) (en banc). We recognized in *Hornstein* that a court "usurps legislative functions when it presumes to adjudge a law void where the repugnancy between the law and the Constitution is not established beyond reasonable doubt." *Id.* at 533 (citation and internal quotation marks omitted). In language apposite to the present controversy, we stated that "[l]aws adjusting the burdens and benefits of economic life come to the courts with a presumption of constitutionality, and one complaining of a due process violation must establish that the legislature acted in an arbitrary and irrational way." *Id.* at 533–34 (citation omitted). Lip service to the presumption of constitutionality will not do, and Riggs must make a "very compelling

---

1 D. EPSTEIN, *et al.*, UNCLAIMED PROPERTY LAW AND REPORTING FORMS, § 3.05[1] at 3–22 to 3–23 (1990). At first blush, both interpretations lend some support to the position of Riggs and WABA, since each makes coverage dependent on the date the bank came into possession of the property. The authors also cite some discussion in 1954 between two of the Uniform Law Commissioners in support of this approach. *Id.* at 3–23 to 3–24.

We find it difficult to reconcile this concern with the date property was received by the holder even with the language of the 1954 provision, which, like Section 42–242, makes no reference at all to that subject. In any event, our statute cannot be interpreted as turning on the time of acquisition because, as we note in the text, Section 42–201 explicitly states that it reaches *all personal property without regard to any maximum length of time for which such property was abandoned.* If property which was abandoned many decades ago is covered, then *a fortiori* property which the bank received many years ago is also covered, for the bank necessarily received it before the owner abandoned it.

**17.** See note 14, *supra.*

**18.** See page 1243 note 23, *infra.*

showing indeed" to overcome it. *Id.* at 534.

The decision on which Riggs principally relies is *Chase Secs. Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). That case is not helpful to its cause. As the Supreme Court stated in *Chase,*

> [i]n *Campbell v. Holt,* [115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885) ] this Court held that where lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations, even after right of action is barred thereby, restore to the plaintiff his remedy, and divest the defendant of the statutory bar. This has long stood as a statement of the law of the Fourteenth Amendment, and we agree with the court below that its holding is applicable here and fatal to the contentions of appellant.

*Id.,* 325 U.S. at 311–12, 65 S.Ct. at 1141. In *Chase,* the Court expressly declined an invitation to reconsider *Campbell,* which had established the same proposition in no uncertain terms.[19] The Court recognized that "[s]ome rules of law probably could not be changed retroactively without hardship and oppression," 325 U.S. at 315, 65 S.Ct. at 1143, and that it might be possible to manipulate a statute of limitations in a way which would offend the Constitution. *Id.* at 315–16, 65 S.Ct. at 1142–43. To restore a remedy lost through mere lapse of time, however, does not violate due process in the absence of a showing of *"special* hardships or oppressive effects." *Id.* at 316, 65 S.Ct. at 1143 (emphasis added).

As the Judiciary Committee recognized in its comments on the UPA, it is

> well established that the District's statute of limitations vests no property rights. Conversely, it is a statute of repose. *Hall v. District of Columbia,* 47 App.D.C. 552 (1918). The statute of limitations here extinguishes only a claimant's remedy by withdrawing from the claimant the privilege of using the courts to enforce a right, but it does not extinguish the right of ownership itself. *Cafritz v. Koslow,* 83 U.S.App.D.C. 212, 214, 167 F.2d 749 (1948).

COMMITTEE REPORT, *supra,* at 10. Accordingly, Riggs had no constitutionally protected expectation which Section 42–242, as construed by the trial court, could or did impair.

We are also unable to discern in the present case anything even approaching a "special hardship" or an "oppressive effect." To put a belated end to a multi-million dollar windfall is not an act of oppression, and Riggs suffers no hardship. Rather, the result for which Riggs contends would amount to "the attempted interposition of the defendant's private escheat law [which] is clearly opposed to the spirit and essence of the public custodial escheat law and to the broad public policy represented thereby." *State v. Jefferson Lake Sulphur Co.,* 36 N.J. 577, 596, 178 A.2d 329, 338–39, *cert. denied,* 370 U.S. 158, 82 S.Ct. 1253, 8 L.Ed.2d 402 (1962). It would preserve for several more years "a private escheat law whereby the holder rather than the state would enjoy the benefit of the unclaimed property." *People v. Marshall Field & Co.,* 83 Ill.App.3d 811, 818, 38 Ill.Dec. 944, 950, 404 N.E.2d 368, 374

---

19. In *Campbell, supra,* 115 U.S. at 628, 6 S.Ct. at 213, the Court pulled no punches at all:

> We certainly do not understand that a right to defeat a just debt by the statute of limitations is a vested right, so as to be beyond legislative power in a proper case. The statutes of limitation, as often asserted and especially by this court, are founded in public needs and public policy—are arbitrary enactments by the law-making power. *Tioga Railroad v. Blossburg and Corning Railroad,* 20 Wall. 137, 150 [22 L.Ed. 331]. And other statutes, shortening the period or making it longer, which is necessary

> to its operation, have always been held to be within the legislative power until the bar is complete. The right does not enter into or become a part of the contract. No man promises to pay money with any view to being released from that obligation by lapse of time. It violates no right of his, therefore, when the legislature says, time shall be no bar, though such was the law when the contract was made. The authorities we have cited, especially in this court, show that no right is destroyed when the law restores a remedy which had been lost.

(1980). At the very least, a finding of hardship or oppression depends on a showing that the equities favor the claimant. As the trial judge pointed out during argument below,

> Riggs doesn't have any equities here. If anything, Riggs has the windfall. It's had the use of money that wasn't its money for some period of time, and it's been able to do whatever it wanted to do with that money....

Indeed, counsel for Riggs effectively acknowledged in the trial court that the equities on this issue were not in his client's favor.[20]

Riggs also claims that it relied to its detriment on the expiration of the statute of limitations because its "conduct would have been different if the present rule had been known and the change foreseen." *Chase, supra,* 325 U.S. at 315–16, 65 S.Ct. at 1143. The bank says that it "maintained no special reserves against the day when the Superior Court's construction of a recent statute would attempt to resurrect such long-interred liabilities." [Brief at 32]. Instead, it "took the statute of limitations at its word and received into income the amount of the lapsed claims, duly paying all required taxes on that income." [*Id.* at 32–33].[21] We recognize that unexpected obligations are never welcome, but Riggs

has made no attempt to demonstrate that any actual hardship resulted from its failure to maintain a special reserve, nor has it shown how its position would be more favorable if funds had been withdrawn from some other account and placed in such a reserve. The District points out, and Riggs apparently does not deny, that if Riggs has paid taxes on property which it converted to income, it will have a roughly comparable reduction in taxes after the property is delivered to the District. This is no hardship or oppression, special or otherwise.

\* \* \* \* \* \*

The contention made by WABA and joined by Riggs that Section 42–242 should be construed not to reach the disputed funds in order to avoid a constitutional issue need not detain us long. Statutes are to be construed "so as to avoid *serious* doubts as to their constitutionality...." *Communications Workers of America v. Beck,* 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, L.Ed.2d 634 (1988) (emphasis added); *see also Blackmer v. United States,* 60 App.D.C. 141, 145, 49 F.2d 523, 527 (1931) (grave doubts), *aff'd,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932). For the reasons stated above, we entertain no misgivings, grave or otherwise, regarding the constitu-

---

**20.** "We do make [an equitable argument], your honor, but not as to [this] issue.... This issue doesn't really turn on equities. This is a situation like adverse possession, recognizing that if you have taken use of property for a certain period of time, after a while, it's yours. What you do with it from that time forward is your own business."

**21.** This claim places Riggs in something of a logical conundrum. Riggs admits that the statute of limitations has not even begun to run against the dormant deposit accounts, see page 1238 n. 13, *supra,* but claims that it did run with regard to the uncashed official checks. *Id.* If Riggs took the proceeds of the uncashed checks into income in reliance on the expiration of the statute of limitations, then the very event on which it relied for its actions regarding the official checks required it to stay its hand with respect to the deposits.

Riggs claims that it obtained title to the deposits because they were abandoned and because "abandoned property is owned by him who

takes it into his ownership," (citing *Foulke v. New York Consol. R.R. Co.,* 228 N.Y. 269, 273, 127 N.E. 237, 238 (1920), a case involving a package accidentally left on the subway). But since the expiration of the statute of limitations did not vest title in Riggs with respect to the funds to which it was arguably applicable, *Hall, supra,* then *a fortiori* there was no transfer of title with respect to funds to which the statute is concededly inapplicable. Moreover, counsel for Riggs described the bank's abandonment claim to the trial judge as akin to adverse possession. But adverse possession requires an open, notorious, exclusive and hostile holding, of which the record owner is obviously aware. *See Smith v. Tippett,* 569 A.2d 1186, 1190 (D.C.1990). There was nothing of the kind here; indeed, when the owner of a dormant account sought to make a withdrawal, Riggs admittedly accommodated him or her as a matter of course. The analogy to adverse possession is therefore gravely flawed, and the claim that Riggs obtained title to the deposits by abandonment is unpersuasive.

tionality of the Act as construed by the trial judge.[22]

WABA's theory that the application of the UPA to funds taken into income amounts to an uncompensated taking was not raised by Riggs in the trial court. Even if it had been, it would necessarily fail, for the funds as to which delivery was ordered were not the property of Riggs. Under the trial court's decree, the District simply replaces Riggs as their custodian.

### D. Conclusion.

■ We conclude that Riggs must report and deliver to the District the funds in the first disputed category without regard to the date Riggs received them, whether or not they were carried on the bank's books as income, and regardless of the alleged expiration, before or after January 1, 1980, of any statute of limitations. This result is consistent with the language of the UPA and with its legislative history. Neither the statutory policy favoring uniformity of decisions under the UPA nor the Constitution supports a contrary holding.[23] The trial judge correctly entered summary judgment in the District's favor on this issue.

## IV

## DEPOSIT ACCOUNTS OF NON–RESIDENT OWNERS

■ "We were admonished of old," according to Judge Alexander Holtzoff, that "[t]he letter killeth but the spirit giveth life." *National Capital Girl Scout Council v. District Unemployment Compensation Bd.*, 231 F.Supp. 546, 547 (D.D.C. 1964). On the question of the disputed dormant accounts apparently owned by residents of other jurisdictions, we conclude that the letter of the statute must prevail. If its spirit is to the contrary, which may

**22.** WABA claims to rely on the decision of the Supreme Court of Illinois in *Country Mutual, supra,* as support for the proposition that application of the UPA to funds time-barred at the time of its adoption would present "grave" constitutional problems which should be avoided by its proposed construction. Actually, the result in *Country Mutual* turns on Illinois' rule—different from the District's—that the running of the statute of limitations creates a vested right which cannot be taken away by statute. 40 Ill.2d at 428, 240 N.E.2d at 615. The suggestion that the court expressed "grave constitutional concerns" on any other ground is misleading.

**23.** The District asks us to affirm this portion of the trial judge's decision on a different basis. It focuses on Riggs' acknowledgement that it routinely honored the stale official checks and dormant deposits when requested by the owner to do so. It maintains that Riggs' policy *vis-a-vis* the owners of these checks and deposits, precludes or estops the bank from declining to report and deliver them.

There is some support for the District's position in the legislative history. The Judiciary Committee took the position that

... if the holder does not enforce the statute [of limitations] against the owner it must report and deliver the property to the state. *See South Carolina Tax Commission v. Metropolitan Life Ins. Co.,* 266 S.C. 34, 221 S.E.2d 522 (1975).

COMMITTEE REPORT, *supra,* at 31. Other cases adopting the view taken by the South Carolina court include *Travelers Express Co. v. Regan,*

114 A.D.2d 194, 199, 498 N.Y.S.2d 569, 572 (3d Dept.1986) and *Cory v. Golden State Bank,* 95 Cal.App.3d 360, 369, 157 Cal.Rptr. 538, 543 (1979). To the extent that the Judiciary Committee's citation of the *Metropolitan Life* case constitutes an adoption of its reasoning, Riggs' attempts to distinguish it are academic. We agree, however, that Riggs' policy of not seeking to enforce the statute against the original owners of long-unclaimed funds strengthens the District's position in this litigation.

Riggs argues persuasively, that "enactment of the waiver doctrine would leave the meaning and effect of the UPA exclusively in the hands of holders of unclaimed property like the banks." [Reply brief at 8]. Moreover, it says that "treatment favorable to the long-lost customer is something to be encouraged, not discouraged." [*Id.* at 7]. *See also Washington Dep't of Revenue v. Puget Sound Power & Light Co.,* 103 Wash.2d 501, 504, 694 P.2d 7, 10 (1985) (holding that the defendant had the discretion to waive the statute of limitations occasionally without losing the right to assert it when it so chose). It is one thing to waive the statute for good customer relations when it costs the bank a hundred dollars and quite another thing to do so when the price would be a million dollars. Accordingly, we adopt the waiver theory to the extent that it is implicitly approved in the COMMITTEE REPORT, and we find the bank's practices *vis-a-vis* customers to be relevant to the question of what is done in the ordinary course of business. See pages 1238–1239 note 10, *supra.* In light of our disposition, we defer to another day the question of the validity of the waiver theory for other purposes.

very well be the case, then the Council will have to demonstrate that this was so by changing the letter.

The trial judge held that

with reference to moneys in the dormant accounts belonging to residents of non-reciprocal states, it seems to me that the District is clearly not required to establish that the states with which it does not have reciprocal agreements do not have laws applicable to these funds. The presumption of this legislation is in favor of abandonment and of escheat to the District of Columbia, not of private escheat by the Riggs Bank or any other bank.[24]

We have considerable sympathy with what the judge had to say, for the District has made a persuasive showing that the judge's interpretation is consistent with what a legislative body seeking to vindicate the purposes of the Act might well have intended. The problem is that this is not what the Council said.

*A. The Letter.*

Section 104 of the UPA, D.C.Code § 42–204, is entitled "Conditions precedent to presumption of abandonment." A condition precedent is an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance arises. *United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir.1963) *cert. denied*, 376 U.S. 943, 84 S.Ct. 798, 11 L.Ed.2d 767 (1964); *see also* J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS § 11.3, at 384 (2d ed. 1977); 3A A. CORBIN, CORBIN ON CONTRACTS §§ 627–628, & n. 8 at 11–19 (1960).

Section 42–204 provides that the presumption of abandonment applies if the conditions described in sections 42–203 and 42–205 through 42–216, which deal with specified periods of inactivity, are satisfied, and if "the last known address of the apparent owner ... is [either] in the District," Section 42–204(1), or

in a State that does not provide an escheat or abandoned property law applicable to the property in question and the holder is ... domiciled in the District. Section 42–204(3). The District does not contend that it has established, with respect to the dormant accounts apparently owned by non-residents of the District, that the states in which these owners reside do not have escheat or abandoned property laws applicable to the property. It thus cannot claim that the conditions precedent set forth in the statute have been satisfied. Indeed, when asked at argument whether he acknowledged that the statutory language was contrary to his position, counsel for the District responded "I have to." His concession was both candid and correct.

The District contends that Section 42–204 "must be read as simply establishing a statutory set of priorities when States file claims with the District in accordance with [Section 42–226]." [25] We agree, however, with Riggs' response to this contention:

It is not, however, that the statute "must be read" to accomplish this result, it "must be rewritten" to do it. First, the title of [Section 42–204] "Conditions precedent to presumption of abandonment," must be treated as if it were not there. Second, there must be removed from the body of [Section 42–204] the requirement that both the defining characteristics of presumptively abandoned property "and" the criteria of [Section 42–204] be satisfied before "property is subject to a presumption of abandonment." And finally, to achieve the District's reading of [Section 42–204], there must be added to it something that connects [Section 42–204] to [Section 42–226] and establishes that connection as its only purpose.

Riggs Reply brief at 36.

Riggs correctly contends that "statutory skin grafts" would be required to reconcile

---

24. The judge also noted that Riggs had indicated readiness to deliver these funds to the District in exchange for a satisfactory indemnification agreement.

25. Section 42–226 is entitled "Claim of state to recover property" and authorizes a State to re-

cover property from the District if it has been delivered to the District pursuant to the UPA, if the owner's last known address is in the demanding State, and if the State has a right to the property under its own law of escheat or abandonment.

the District's interpretation with the statutory language. The District's burden to show that such surgery is required must necessarily be a heavy one.

### B. The Spirit.

The Corporation Counsel makes the following argument against the result to which a literal interpretation of Section 42–204 seems to lead us:

> Riggs' interpretation of [Section 42–204] thwarts all three of the Act's central purposes: of giving the District use of abandoned property until claimants with greater rights to the property assert their rights; of facilitating recovery of property by states with superior claims; and of reconciling owners with property. By not delivering the property to the District, the bank continues to enjoy its use at the District's expense. By withholding information, it prevents recovery of the property by the District, the states, and by the owners, allowing the bank to remain cheerfully in possession in perpetuity. The Council was fully aware that banks and other private holders could subvert *Texas v. New Jersey* by not reporting abandoned property: "the right given by *Texas v. New Jersey* is a hollow one if the state is without sufficient information to assert its claim * * *." This is especially true as a practical matter since no state has the means to compel hundreds of thousands of holders of abandoned property outside the state—banks, insurance companies, dividend-paying businesses, and the like—to provide information on their holdings. In addition, institutions such as Riggs and other banks with localized activities are immune from suit in the many jurisdictions in which they do no business but whose residents' property they hold. That means that states generally have no effective way of coercing reporting or payment. In short, Riggs continues to hold abandoned property for no one's benefit, except its own.

District Brief at 23–24 (footnote and citation omitted). We find this reasoning to be quite compelling.

Riggs and WABA say that the "spirit" of the law is on their side because the UPA adopts the philosophy of *Texas v. New Jersey, supra,* and because the result urged by the District would subject Riggs to the threat of multiple liability. Neither contention is persuasive. In *Texas v. New Jersey,* the Court decided that the State of the owner's last known address has first priority to his unclaimed property. 379 U.S. 674, 680–82, 85 S.Ct. 626, 630–31, 13 L.Ed.2d 596 (1965). Relying on its earlier decision in *Western Union Telegraph Co. v. Pennsylvania,* 368 U.S. 71, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961), the Court also held that the same abandoned property cannot constitutionally escheat to more than one State. 379 U.S. at 676–79, 85 S.Ct. at 628–29. The Judiciary Committee referred repeatedly to the decision in *Texas v. New Jersey,* and we think it fair to conclude the legislation was enacted with that case in mind.

We do not believe, however, that *Texas v. New Jersey* bars the District from reaching the accounts in question. That case dealt with the competing claims of different jurisdictions for escheat of the same property. The Court was not confronted with, nor did it decide, the relative rights to custody of abandoned property as between a private holder and a State. The UPA is not an escheat statute, and by taking custody of abandoned property from a private holder, the District does not divest the priority jurisdiction of custody or title. Consistent with the treatment of property in which there is no last known address and where the jurisdiction of the owner's last known address has no applicable abandoned property law, it would be consistent both with *Texas v. New Jersey* and with the general philosophy of the Act to permit the District to retain the property for itself until some other State comes forward with proof that it has a superior right to it. As the Supreme Court of Texas said of *Texas v. New Jersey* in *State v. Liquidating Trustees of Republic Petroleum Co.,* 510 S.W.2d 311, 315 (Tex.1974),

> [w]e interpret that decision to mean that in a suit strictly between the domiciliary State and a resident stakeholder, the

State is entitled to a judgment against the stakeholder for custody of the property, subject to some other State coming forward at a subsequent time with proof that it has a superior right to escheat or custody. This is the only interpretation which would permit the purpose of State escheat and custodial laws to be effective as to abandoned properties within the jurisdiction of one State but owed to disappeared persons with last known addresses in States which have no jurisdiction to require reporting or delivery of the property. At least this interpretation and result in the present case would bring the funds into the custody of the State Treasurer of Texas, where reports and procedures would be available under the Texas Act for other States to learn of the funds and assert administratively and in our courts any superior rights which they may claim.

See also *State v. Chubb Corp.*, 239 N.J.Super. 257, 265–66, 570 A.2d 1313, 1316–17 (1989) (granting State custody of unclaimed funds from defendants with offices in State ensures that it is used for the "general good rather than for the chance enrichment of particular individuals or organizations;"[26] public policy supporting escheat is "vastly superior" to any claim that private holders may have for refusing to deliver unclaimed funds to the custody of State Treasurer). The "spirit" of *Texas v.*

*New Jersey* does not trump the District's contentions.[27]

In light of these considerations, we would be inclined, but for the "condition precedent" language in Section 42–204, to agree that the District's interpretation of that section is more in harmony with the "spirit" of the legislation than the result urged by Riggs and WABA. The question before us therefore boils down to whether we may, or should, ignore the conditions precedent which the Council unambiguously placed in the statute on the theory that the Council did not mean what it said, and in order to further the policies which underlie the UPA as a whole.

### C. The Decision.

Addressing the retroactivity issue, with respect to which the statutory language is more to its liking than the language of Section 42–204, the District cites *Burlington Northern R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987), for the proposition that, absent a clearly expressed legislative intention to the contrary, unambiguous statutory language is conclusive and judicial inquiry as to its meaning complete. District Brief at 28 n. 32. We agree with this principle of statutory construction, and are constrained to add that its application in a particular instance cannot be made to depend on whose ox is being gored.

---

**26.** The court was quoting *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 435–36, 71 S.Ct. 822, 826–27, 95 L.Ed. 1078 (1951).

**27.** Riggs also maintains that it should be protected from reporting and delivering these accounts to the District because a requirement that it do so may subject it to multiple liability for the same funds. We find this contention unpersuasive, for substantial protection against such an eventuality is provided to holders by the UPA. Section 42–220(a) provides that

[a]ny person who pays or delivers property to the Mayor in good faith under this chapter is relieved of all liability to the extent of the value of the property so paid or delivered for any claim *then existing or which may arise thereafter* with respect to the property.

(Emphasis added). Section 42–220(b) entitles any holder who delivers abandoned money to the District to reimbursement upon proof that he has honored a subsequent request for pay-

ment by the owner of the property. In the alternative, Section 42–220(c) authorizes the holder to reclaim property delivered to the District upon proof that the owner has requested return of the property from the holder.

The identical defense of double liability which Riggs asserts in the present case was advanced in *Republic Petroleum Co., supra*. Interpreting a Texas statute virtually identical to Section 42–220, the court discounted the prospect of multiple liability because

not only are the [holders] expressly relieved by the State of any liability, but express provisions are made for reimbursement to any person, including any State, which comes forward with proof of a valid superior claim to any of such funds which are delivered by the holders to the custody of the State Treasurer.

510 S.W.2d at 314; *see also Chubb, supra,* 239 N.J.Super. at 265, 570 A.2d at 1316.

The Judiciary Committee's discussion of the provision we are now construing was very brief:

> Section [42-204] is a new section added to original Bill 3-267. The section describes the five circumstances under which intangible personal property can be deemed abandoned under this bill. Subsections (a), (b), and (c) restate the rules of *Texas v. New Jersey.*

COMMITTEE REPORT, *supra*, at 15. The "conditions precedent" are denominated in the Report as "circumstances under which" the presumption of abandonment can apply. Any distinction between "conditions precedent" and "circumstances under which" seems to us to be more or less without a difference.

But, says the District, "interpretations of statutes that yield absurd results or defeat their plain purposes should be rejected." Brief at 24. We cannot agree that a literal interpretation of Section 42-204 is absurd. In *Parreco, supra,* 567 A.2d at 48 n. 7, adopting the teaching of *Church of the Holy Trinity v. United States,* 143 U.S. 457, 460-61, 12 S.Ct. 511, 515-16, 36 L.Ed. 226 (1892), we suggested two examples of true absurdity. The first was the prosecution of a sheriff for obstructing the mails where he was executing a warrant to arrest the mail carrier for murder. The second was the invocation of a medieval law prohibiting the drawing of blood in the streets against a physician who came to the aid of a man who had fallen down in a fit.

The contrast between the foregoing illustrations and the present case is revealing. A literal interpretation of the UPA may not represent ideal social policy, but it is not absurd. An abandoned property law which reaches all such property in the bank's possession would perhaps be preferable as a matter of legislative policy to one that does not apply to property subject to escheat in another state. A statute that goes a step at a time, however, and deals only with property as to which the District is the sole sovereign which could assert rights, can hardly be dismissed as ridiculous or absurd in the sense used in *Holy Trinity* and *Parreco.*

Nor does a literal interpretation of Section 42-204 defeat the "plain purposes" of the statute. Rather, it limits those purposes in the manner described above. It makes the statute a less comprehensive one and gives the District half a loaf rather than the entire loaf all at once.

There is nothing unusual about a statute doing that. Indeed, this is often how legislative majorities are forged. The political process is full of give and take, thrust and parry, demand, counter-demand and accommodation. Just as the validity of legislation "must be considered in the context of the real world, warts and all, with its hard bargaining and legislative compromises," *Hornstein, supra,* 560 A.2d at 535, so, too, recognition of that real world must be a part of the process of statutory interpretation. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *In re Baker,* 579 A.2d 676, 682 (D.C.1990) (quoting *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913).

Like the federal courts, we "do not sit as [a] council of revision, empowered to rewrite legislation in accord with [our] own conceptions of prudent public policy." *United States v. Rutherford,* 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). Only when the literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to the legislative design will an exception to statutory language be judicially implied. *Id.* As we stated in *Parreco, supra,* 567 A.2d at 46 (quoting *Public Citizen v. United States Dep't of Justice,* —— U.S. ——, 109 S.Ct. 2558, 2575, 105 L.Ed.2d 377 (1989)) (Kennedy, J. dissenting):

> To invoke too readily the "absurd result" doctrine, or related notions which are said to justify the disregard of statutory language, creates too great a risk that the Court is exercising its own "WILL instead of JUDGMENT," with the consequence of "substitut[ing] [its own] pleasure to that of the legislative body." The

Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton).

We think that Mr. Hamilton had it right.

There is no doubt that our literal construction of Section 42–204 enables Riggs, for what one might reasonably believe to be less than persuasive reasons of policy, to retain custody and use of funds which would be more appropriately held and used by the District, or by a priority state which could learn of their existence from the District only if Riggs were required to deliver them. This result may be unfair to the citizens of this jurisdiction or of a priority state. But

> [i]f the Council perceives such unfairness, or if it intended a result different from the one we reach, a remedy may easily be fashioned. In the absence of ambiguity in the statute, however, correction of any problem that may be presented is the province of the legislature rather than of this court.

*Parreco, supra,* 567 A.2d at 50.

The trial judge did not explicitly address the words "condition precedent" in Section 42–204 in granting summary judgment to the District on this claim. We think that the Council's use of the quoted phrase is dispositive. This portion of the judge's decision must therefore be set aside.

## V

### SERVICE CHARGES IMPOSED ON DORMANT ACCOUNTS

*A. The Issue.*

The final category of funds in dispute consists of service charges imposed on dormant accounts held by Riggs from January 1, 1980 through April 1982 and the interest that would have accrued on these accounts but for the imposition of the service charges. The District contends that these charges were imposed in violation of the UPA, and that Riggs is required to report and deliver to the District a sum equivalent to the deducted charges and interest. Riggs contends that the District has failed

to prove that its conduct contravened the Act.

Section 42–206(e) provides that

[n]o holder may impose ... any charges due to dormancy or inactivity, or cease payment of interest unless:

(1) There is a valid enforceable contract between the holder and the owner of the property pursuant to which the holder may impose such charges or cease payment of interest;

(2) The holder regularly imposes such charges or ceases accrual or payment of interest and does not regularly reverse or otherwise cancel such charges or retroactively pay interest with respect to such property; and

(3) For property in excess of $10, the holder, *no more than three months prior* to the initial imposition of such charges or cessation of interest, gives written notice to the owner of the amount of such charges at the last known address of the owner that the charges will be imposed or that interest will cease.

The dispute as to the service charges focuses on paragraphs (1) and (3) of Section 42–206(e). The District contends that there was no enforceable contract between Riggs and the owners of the respective accounts because the signature cards which Riggs characterizes as constituting contracts are inadequate. Specifically, the District claims that these signature cards contain no notice, or inadequate notice, of the service charges to be imposed, and that some of them provide no warning at all that the depositor has entered into a contract. Riggs responds that the signature cards constitute valid deposit agreements which conform to general banking practice and which have been held to be adequate in a number of other jurisdictions.

The District also contends that Riggs did not provide the three months notice required by Section 42–206(e)(3) to the owners of dormant accounts. Riggs acknowledges that it did not provide such notice, but argues that the District has not established that any of the accounts contained funds in excess of ten dollars. Riggs says that the District has therefore failed to

satisfy its burden of proof on this issue. The District responds that it was incumbent upon Riggs to establish that the accounts contained less than ten dollars.

## B. The Trial Court's Decision.

The trial judge denied Riggs' motion for summary judgment with respect to the service charges and granted the District's motion. He expressed the view that if the signature cards were contracts of any kind, they were contracts of adhesion. He commented that the size of the print of the purported contractual language, and its positioning on the rear of a card containing a large space for a signature, were "virtually calculated not to be read by a customer as a contract of agreement with a bank." He also observed that the charges were not specified in the purported contracts, and stated that he had the impression that "these cards are invariably presented to customers not as contracts, but as devices for banks to maintain a record of the signatures of customers." The judge said that it would be up to the trier of fact to draw the appropriate inference as to how the contracts were presented, however, and that he could not decide this issue on summary judgment.

The judge also found it to be "clear beyond peradventure" that Riggs had failed to comply with the three-month notice requirement as to any accounts containing in excess of ten dollars. He did not expressly rule on the question whether Riggs was required to prove that an account contained ten dollars or less or whether the District had the obligation to prove the opposite. By granting summary judgment to the District, however, the judge at least implicitly placed the burden on Riggs.

## C. Burden of Proof.

■ The District contends that in order to sustain the imposition of service charges, Riggs has the burden of establishing that it has complied with all three paragraphs of Section 42-206(e). Riggs and WABA respond that on the contrary, the District, like any plaintiff, has the burden of persuasion on this issue, and must prove its case.

According to the District, Section 42-206(e) creates a general proscription against service charges, but provides for an exception to the general rule if the three conditions of Section 42-206(e) are met. That seems to us to be a correct appraisal of the structure of the section. The key words in the opening sentence are that "no holder may impose ... any charges ... *unless*" [the enumerated conditions are met]. The primary meaning of the word "unless" is "under any other circumstance than that: *except on the condition that.*" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2503 (1966) (emphasis added). The words that follow "unless" therefore constitute an exception to the general rule of Section 42-206(e).[28]

In the enforcement of remedial statutes, "it has been the practice to cast the burden of proving an exception to the general policy of the statute upon the person claiming it." *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228, 232 (5th Cir.1969) (prohibition against discrimination in employment);[29] *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1297 (D.C.1990) (rent control). A proscription against relatively minor service charges on dormant bank accounts does not, standing alone, carry the remedial wallop of legislation designed to end invidious discrimination or to protect the supply of housing available to persons of limited means. Nevertheless, Section 42-206(e) is a part of the UPA, and the remedial character of the statute as a whole is not subject to dispute.

---

**28.** The language of Section 42-206(e) stands in stark contrast to that of Section 42-204, discussed *supra* at pages 1243–1248, in which proof of the existence of the necessary facts is made a condition precedent of coverage.

**29.** Riggs' suggestion that *Weeks* was overruled in this regard by *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, ——, 109 S.Ct. 2115, 2116, 104 L.Ed.2d 733 (1989) is devoid of merit. *Antonio* dealt with inferences from statistical evidence, not with the burden of demonstrating entitlement to an exception from coverage.

The regulations promulgated pursuant to Section 42–238 provide that a holder who files an abandoned property report pursuant to the UPA is subject to the following requirements:

If service charges have been deducted, a holder shall include or attach as part of the report the following:

(a) The citation to the authority or copy of the form [or] contract authorizing the service charge(s);

(b) The value or amount of each item of property before any service charge(s) were deducted; and

(c) The amount of service charge(s) deducted from each item and the date(s) on which the service charge(s) were deducted.

9 DCMR § 3004.7 (1986). *See also* 9 DCMR § 3004.12 (1986). The regulation makes no specific allusion to the burden of proof. This reporting procedure requires, however, that the holder demonstrate through his report that he is not subject to a general prohibition which is otherwise controlling. Under the regulation, he must establish a basis for exemption from the presumptive ban, failing which no service charge may be imposed.

In addition, the facts regarding Riggs' service charges are "more likely to be within the knowledge of the [bank] than of the [government and] considerations of fairness argue for placement of the burden [of persuasion] on [the bank]." *Green v. District of Columbia Dep't of Employment Servs.*, 499 A.2d 870, 876 (D.C.1985). This consideration should not be overemphasized, for expanded pretrial discovery has reduced its significance in allocating the burden of proof. E. CLEARY, McCORMICK ON EVIDENCE § 337, at 950 & n. 11 (3d ed. 1984). The availability of such discovery, however, although relevant, is not decisive. In *Fitzgerald v. Wright*, 155 N.J.Super. 494, 498, 382 A.2d 1162, 1165 (1978), the court recognized that the defendant in a no-fault case had some ability to "ferret

out [through discovery] the requisite data [as to whether the plaintiff's medical expenses had met the statutory no-fault threshold]," but nevertheless allocated the burden of proof to the plaintiff because it was he who was "privy to the knowledge and information required to determine whether the threshold has been met." In the present case, discovery procedures notwithstanding, Riggs is obviously in a better position than the government to understand and evaluate the meaning of its own records with respect to its practices regarding service charges.[30]

Although perhaps none of the foregoing considerations would be sufficient, standing alone, to sustain a departure from the general rule that the burden of proof rests with the plaintiff, we conclude that the phrasing and structure of Section 42–206(e), the use of the word "unless," the remedial character of the Act, the procedures under the implementing regulations, and Riggs' superior access to relevant data cumulatively sustain the District's position that Riggs must carry the burden of persuasion with respect to the service charge issue.

## D. The Validity of the Purported Contract.

Having examined the signature cards on which Riggs relies for its claim that it complied with Section 42–206(a), we share the trial judge's misgivings in regard to the basic fairness of characterizing them as a contract in which the customer agreed to the imposition of service charges. As the District points out, brief at 38,

a depositor given a signature card to sign for the purpose of preventing fraudulent transfers is not likely to be aware that the obverse side of the card contains terms and conditions of a contract. Nothing in the record demonstrates that the bank called these terms or conditions

---

**30.** *Thomas v. District of Columbia Bd. of Appeals and Review,* 355 A.2d 789 (D.C.1976), cited by Riggs, is of little assistance to it. This court there declined to relieve the plaintiff of his burden because the facts were equally available

to both sides and because the party to whom the plaintiff proposed to shift the burden "may well have no knowledge by which to negate possible liability." *Id.* at 793.

to depositors' attention at the time the account was opened.

In light of concessions made by the District in the trial court, however, we think that Riggs must prevail on this issue.

■■■ It is generally held that a binding contract between a bank and its depositors is created by a deposit agreement contained on a signature card. *See, e.g., Bennett v. First Nat'l Bank*, 443 F.2d 518, 520 (8th Cir.1971); *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 919, 702 P.2d 503, 509, 216 Cal.Rptr. 345, 351 (1985), *appeal dismissed* 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986); *In re Estate of Cilvik*, 439 Pa. 522, 525, 267 A.2d 836, 838 & n. 2 (1970). Such a contract may be one of adhesion, and is therefore subject to judicial scrutiny for unconscionability. *Perdue, supra*, 38 Cal.3d at 922, 702 P.2d at 511–12, 216 Cal.Rptr. at 354. To establish unconscionability, however, the District must prove not only that one of the parties lacked a meaningful choice but also that the terms of the contract are unreasonably favorable to the other party. *Williams v. Walker–Thomas Furniture Co.*, 121 U.S. App.D.C. 315, 319, 350 F.2d 445, 449 (1965); *see also Perdue, supra*, 38 Cal.3d at 924, 216 Cal.Rptr. at 354–55, 702 P.2d at 512–13.[31]

In support of its motion for summary judgment on the service charge issue, Riggs set forth, and the District conceded as not in dispute, the following facts:

> Riggs' signature cards and the Rules and Regulations governing savings deposits at the bank have long carried a provision informing customers that the bank is authorized to impose service charges on small inactive accounts.

> \* \* \* \* \* \*

> At the beginning of 1980, both the signature card in use for savings accounts and

Section J of the Rules and Regulations governing savings deposits informed customers that the bank would impose "a reasonable service charge ... on accounts with balances less than $50.00 which have been inactive for three years or more."

\* \* \* \* \* \*

> During the period 1980–82, the service charges on dormant accounts were imposed in March and September, and were shown as service charges on the quarterly statements mailed to each customer for whom the bank still had an address.

\* \* \* \* \* \*

> The signature cards used by Riggs on savings accounts conformed with generally accepted banking practices for the drafting of signature cards.

The District filed no affidavits in the trial court by customers claiming to have been misled by the allegedly inadequate disclosure on the signature card and offered no proof that the charges were unreasonably high. Given the District's concession that Riggs' signature cards were consistent with generally accepted banking practices and the judicial consensus that such cards create a valid contract between the bank and the customer, we think that, for purposes of this litigation, Riggs has met its burden under Section 42–206(e)(1) of proving a valid and enforceable contract between holder and owner. We emphasize that we find the use of these cards troubling, and that it is the District's acceptance as undisputed of Riggs' basic allegations about them that has put Riggs over the top. A different result might well follow on a different record.

### E. The Alleged Lack of Notice.

■■■ The District contends that it was incumbent upon Riggs to establish that

---

**31.** The District relies primarily on *Cory v. Golden State Bank,* 95 Cal.App.3d 360, 157 Cal.Rptr. 538 (1979), in which the court held that a statement printed on the customer's copy of a money order, which purported to permit assessment of a service charge if the order was not cashed within a year, was not enforceable because

> an offeree, regardless of apparent manifestation of his consent, is not bound by inconspic-

uous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.

*Id.* at 366, 157 Cal.Rptr. at 541. The validity of this decision may be in question in view of the holding of the Supreme Court of California in *Perdue* that a signature card is a valid contract even if it permits the unilateral setting of charges.

each account as to which three months notice was not provided had a balance of less than ten dollars. Putting all of its eggs in the basket invisibly labelled "the District has the burden of proof," Riggs offered no such evidence. The label turned out to be wrong, however, and under a "sporting contest" theory of justice,[32] that might perhaps end our consideration of the matter; litigants generally have to live with their counsel's tactical decisions.

In the present case, however, there is strong evidence that many of the accounts had balances of less than ten dollars. Riggs explains that

[e]ffective March 1, 1980 Riggs charged dormant accounts $8.00 semiannually in March and September. The record shows that the first imposition of such charges relevant here was on March 9, 1980. It yielded $37,945.70 from charges applied against 6,875 accounts. No fewer than 3,803 of these accounts were closed out as a result of the imposition of the $8.00 service charge in March 1980. This establishes that these accounts had total balances of $8.00 or less before the service charge was imposed. The remaining 3,072 accounts would have had balances of between $8.01 and $50.00 at the time the service charges were imposed. It is likely, however, that many of these totaled between $8.01 and $10.00 because, although 1,311 new dormant accounts were transferred to the dormant list by September 1980, when the second $8.00 charge was made, those charges yielded only $24,757.74. Imposition of the $8.00 service charge in September 1980 was sufficient to close out 2,295 of the 4,383 dormant accounts that were subject to service charges at that time. This pattern continued through April 1982 despite the addition of new dormant accounts. It thus appears that a vast majority of the $117,637.13 claimed by the District was derived from service charges on accounts of $10 or less at the time the charges were first imposed.

Riggs brief at 43 (citations to record omitted).

The trial judge granted the District's motion for summary judgment on the service charge issue. In *District of Columbia v. Pierce Assocs., Inc.,* 527 A.2d 306, 312 (D.C.1987), this court articulated the applicable principles as follows:

Summary judgment is permissible only when no genuine issue of material fact exists, after all inferences in the record are drawn against the moving party. *Spellman v. American Security Bank,* 504 A.2d 1119, 1122 (D.C.1986); *Phenix–Georgetown v. Charles H. Thompkins Co.,* 477 A.2d 215, 221 (D.C.1984). *See* Super.Ct.Civ.R. 56(c). To be successful, the moving party has the burden of demonstrating the absence of any material factual issue. *Spellman, supra,* 504 A.2d at 1122. When reviewing a trial court's order granting summary judgment, this court must conduct an independent review of the record. *Phenix–Georgetown, supra,* 477 A.2d at 221.

A material issue of fact is obviously presented as to whether any particular account against which a service charge was imposed contained more than ten dollars. Riggs did not prove that it did; the District was not required to, and did not, show the contrary. There can be little doubt that some accounts exceeded the ten-dollar threshold and that some did not. We are not prepared to treat as fatal Riggs' failure to submit proof, account by account, as to the balance in each one, where the result of our doing so would significantly distort reality. Assuming that it was a mistake on Riggs' part not to provide such a breakdown "[o]ur Rules, like the Federal Rules of Civil Procedure, 'reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive as to the outcome.'" *Goodman, supra,* 573 A.2d at 1300 (quoting *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). Service charges on accounts

---

**32.** This is not a theory to which we adhere, for judges "are not referees at prize fights but functionaries of justice." *United States v. Liddy,* 166 U.S.App.D.C. 95, 105, 509 F.2d 428, 438, *cert.* denied, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1974) (quoting *Johnson v. United States,* 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948) (Frankfurter, J., dissenting in part)).

containing in excess of ten dollars were unlawful. They must be identified, and Riggs' liability must be based on the charges imposed on those accounts and the accumulated interest on those charges.[33]

# VI

## PRE–JUDGMENT INTEREST

In the trial court, the District requested an award of pre-judgment interest on the sums which it claimed to be due. Remarking only that he agreed with Riggs' arguments to the contrary, the judge declined to make such an award. The District has cross-appealed on that issue, and we agree that it was entitled to pre-judgment interest.

### A. The Legal Principles.

"The medieval world—or [at least] the Christian components of it [34]—viewed interest as an evil." D. DOBBS, HORNBOOK ON THE LAW OF REMEDIES § 3.5, at 165 (1973). Such scruples, however, disappeared from commercial life many years ago. *Id.* As capitalist institutions such as corporations, brokerage houses, credit cards and savings and loan scandals replaced the feudal world of castles and moats and princes and dukes and lords and vassals, the old "purist" view became no more than a quaint relic of a historical past when chivalry counted for more and profit for less.

Interest is not imposed on a debtor's obligation in order to exact a penalty, but to compensate the creditor for the loss of the use of his money. *District of Columbia v. Potomac Elec. Power Co.*, 402 A.2d 430, 441 (D.C.1979). "In modern times the 'penalty theory' of pre-judgment interest increasingly has given way to the 'loss' or 'unjust enrichment' theory.... [T]he important question is whether the plaintiff has been deprived of the use of the money withheld and should be compensated for

the loss." *Pierce Assocs., supra,* 527 A.2d at 311. Where there has been such a deprivation, pre-judgment interest is an element of complete compensation for the loss of use of such money "from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States,* 479 U.S. 305, 310–11 n. 2, 107 S.Ct. 702, 706, n. 2, 93 L.Ed.2d 639 (1987). Where the debtor should have paid what he owed but did not do so, a denial of pre-judgment interest would deny full compensation to the creditor while allowing the recalcitrant party to take advantage of his own wrong and become the richer for it. *Cf. Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232–33, 79 S.Ct. 760, 761–62, 3 L.Ed.2d 770 (1959).

A statutory obligation may bear interest even though the statute makes no provision therefor. *United States v. United Drill & Tool Corp.,* 87 U.S.App.D.C. 236, 237, 183 F.2d 998, 999 (1950). If the obligation is in the nature of a debt, it is deemed interest-bearing, because the statutory purpose was to create a debtor-creditor relationship, and in equity, interest is allowed as a means of compensating a creditor for the loss of the use of his money. *Id.* As the Supreme Court explained more than a century ago,

[i]f a debt ought to be paid at a particular time, and is not, owing to the default of the debtor, the creditor is entitled to interest from that time by way of compensation for the delay in payment. And if the account be stated, as the evidence went to show was the case here, interest begins to run at once.... If there is no statute on the subject, interest will be allowed by way of damages for unreasonably withholding payment of an overdue account.

*Young v. Godbe,* 82 U.S. (15 Wall.) 562, 565–66, 21 L.Ed. 250 (1872).

---

**33.** Several other contentions were made on Riggs' behalf with respect to the issue of the service charges. We find them to be lacking in merit, and none would warrant the grant of summary judgment in Riggs' favor.

**34.** "He hates our sacred nation, and he rails, Even there where merchants most do congregate, On me, my bargains, and my well-won thrift, Which he calls interest...."
W. SHAKESPEARE, THE MERCHANT OF VENICE, Act I, Scene 3 (Shylock, speaking of the anti-Semitic Christian merchant, Antonio).

*B. The Statute.*

Although no explicit statutory authorization is required for an award of pre-judgment interest, the philosophy underlying the authorities cited above finds statutory expression in Section 15–108 of the District of Columbia Code (1989). That section provides that judgment for the plaintiff "in an action to recover a liquidated debt on which interest is payable by contract or by law or usage ... shall include interest on the principal debt from the time it was due and payable ..."

Riggs contends that no debt was created in this case; that if a debt was created, it was not a liquidated one; and that interest is not payable by contract or by law or usage. We do not agree with any of these contentions.

(1) The existence of a debt.

■ When the District was substituted by operation of law as custodian of the abandoned property here at issue, it was granted a statutory right to possession. The moment that Riggs refused to turn over funds which it was obliged to deliver under the Act, it became indebted to the party—here the District—which was entitled to the proceeds. Pursuant to Section 42–219, the District had an immediate right, judicially enforceable under Section 42–233, to possession of the abandoned property within six months of the time when it was or should have been reported as abandoned. *See Connecticut Mut. Life Ins. Co. v. Moore*, 333 U.S. 541, 547, 68 S.Ct. 682, 686, 92 L.Ed. 863 (1948).

That the District becomes the rightful custodian of the abandoned funds, rather than their outright owner, does not make it any the less Riggs' creditor. The UPA was designed to give the District all of the benefits of the use of unclaimed property until such time as its legal owners recover it. *Bank of America Nat'l Trust & Savings Ass'n v. Cory*, 164 Cal.App.3d 66, 71, 210 Cal.Rptr. 351, 355 (1985). Experience has demonstrated that a large portion of the millions of dollars that are turned over to the States under this kind of legislation will never be claimed. *People ex rel. Fah-*

*ner v. Chicago Transit Auth.*, 127 Ill. App.3d 405, 408, 82 Ill.Dec. 536, 538, 468 N.E.2d 1316, 1318 (1984). Indeed, our statute is largely predicated on that experience; its principal purpose is to give the District use of unclaimed property in order to promote the District's "fiscal growth." *See* Section 42–201; COMMITTEE REPORT, *supra*, at 2.

In the simplest terms, Riggs was obliged to pay money representing the abandoned property to the District. When it failed to do so, it became a debtor and the District became its creditor. No more is required.

(2) Whether the debt was liquidated.

Section 15–108 provides that a plaintiff *shall* recover pre-judgment interest on a liquidated debt where the other statutory prerequisites have been met. Where the amount owing is unliquidated, on the other hand, such an award is discretionary. *See* D.C.Code § 15–109 (1989). In *Pierce Assocs., Inc., supra*, 527 A.2d at 311, we explained that

> [a] liquidated debt is one which "at the time it arose, ... was an easily ascertainable sum certain." *Kiser v. Huge*, 170 U.S.App.D.C. 407, 421, 517 F.2d 1237, 1251 (1974), *rev'd in part on other grounds*, 171 U.S.App.D.C. 1, 517 F.2d 1275 (1975) (*en banc*). "Even where a bona fide dispute exists as to a debt, courts generally find the liquidated nature of the debt unaffected." *Giant Food, Inc. v. Bender*, 399 A.2d 1293, 1302 (D.C.1979).

*Cf. District of Columbia v. Campbell*, 580 A.2d 1295, 1300–1301 (D.C.1990); DOBBS, *supra*, § 3.5, at 165.

It is undisputed that the amounts of the official checks and deposits which Riggs must deliver to the District in light of our disposition of the retroactivity issue are "easily ascertainable" and have in fact been ascertained. Accordingly, the debt which we are considering here is a liquidated one.

(3) Contract, statute or usage.

Riggs contends, reply brief at 42, that Section 15–108 is inapplicable because

[t]here is no contract between Riggs and the District; no law, certainly not the UPA, makes such interest payable, and there is no usage under the UPA to the contrary.

Riggs is right with respect to "contract" and "statute", but we hold that it is wrong in its interpretation of "usage".

The words "by law or usage" in the statute might be viewed as somewhat opaque or even inscrutable. The parties have not addressed their meaning in any substantive manner in their briefs. A usage is not a legal rule but a practice in fact. *Electrical Research Products, Inc. v. Gross*, 120 F.2d 301, 305 (9th Cir.1941). It is "a habitual or customary practice, more or less widespread, which prevails within a geographical or sociological area," *Sam Levitz Furniture Co. v. Safeway Stores, Inc.*, 10 Ariz.App. 225, 228, 457 P.2d 938, 941 (1969), *vacated on other grounds*, 105 Ariz. 329, 464 P.2d 612 (1970), or, in this case, a legal area. Given these cases and the common meaning of "usage," we think that the term as used in Section 15–108 refers to what is customary or usual under similar or comparable circumstances.

In *Kiser, supra,* 170 U.S.App.D.C. at 422, 517 F.2d at 1252, the court relied on the "law or usage" clause in the statute in holding that pre-judgment interest was recoverable in a suit to recover accrued pension benefits despite the lack of explicit authorization in the substantive statute. It cited an earlier decision [35] awarding a beneficiary pre-judgment interest from the date when the insurer had wrongfully rejected a demand for payment. In other words, no usage regarding pre-judgment interest in pension benefit claims was required, where such interest had been held to be recoverable in a case which was viewed as analogous in principle.

We think that the court's approach in *Kiser* to "law or usage" was correct. We do not believe that this phrase was designed to import any novel requirement for an award of pre-judgment interest that did not exist prior to its enactment. Moreover,

a statute providing for pre-judgment interest is remedial and should be generously construed so that the wronged party can be made whole. *Cf. Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (back pay in employment discrimination cases).

## C. The Council's Failure to Adopt a Provision for Pre-judgment Interest.

The District's UPA does not contain a provision authorizing an award of pre-judgment interest. The revised Uniform Unclaimed Property Act of 1981, drafted almost simultaneously, includes an explicit authorization. 8A *Uniform Laws Annot.* § 34 at 674 (1983). The authors of the District's statute were apparently familiar with the 1981 draft of the Uniform Act, and Riggs contends that by failing to enact Section 34, they must have intended to prohibit altogether awards of pre-judgment interest. We find this contention unpersuasive.

Silence is a treacherous guide to legislative intent. It is not easy to discern exactly what a legislature intended when it said nothing. We think it most unlikely, however, that the Council's goal here was an implied *pro tanto* repeal of Section 15–108 which would deny the District "make whole" relief routinely available to other comparably situated creditors.

Repeals by implication are not favored. *P & Z Co. v. District of Columbia,* 408 A.2d 1249, 1251 (D.C.1979). "When two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed [legislative] intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). "Only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy." *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 457, 65 S.Ct. 716, 726, 89 L.Ed. 1051 (1945).

---

**35.** *Mutual Benefit Health & Accident Ass'n v. Messina,* 121 U.S.App.D.C. 328, 350 F.2d 458

(1965), *cert. denied,* 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1966).

The UPA contains no "clearly expressed" legislative intention to make the District's general law governing pre-judgment interest inapplicable to violations of its proscriptions. The Act neither authorizes nor prohibits such awards; it has nothing to say about the question. *Cf. Duggan v. Keto*, 554 A.2d 1126, 1140 (D.C.1989). Nowhere in the statutory language or legislative history is there an expression of a legislative intent to limit the effect of Section 15–108 or to give violators of the UPA exceptional protection from otherwise applicable general law. A reasonable interpretation of the Council's silence is probably that it found the enactment of the 1981 draft of Section 34 of the Uniform Act unnecessary because pre-judgment interest was already recoverable under Section 15–108. Moreover, Section 34 proposed a rate of interest higher than the District's statutory rate. D.C. Code § 28–3302(a) (1989). The Council may well have preferred a milder provision, especially in light of its somewhat draconian mandate for civil penalties in Section 42–235, discussed at pages 1256 to 1263, *infra*. In any event, we are not prepared to indulge a presumption, which would fly in the face of the authorities cited, that the Council intended by its silence to proscribe the award of any pre-judgment interest at all.[36]

The District contends and we agree, that its entitlement to interest begins on the date that the abandoned property should have been delivered to the Mayor. A number of questions may arise as to how and at what rate the interest should be computed; *e.g.* whether the obligation to pay the statutory rate, *see Pierce Associates, Inc., supra*, 527 A.2d at 310; D.C.Code § 28–3302(a) (1981 & 1990 Supp.), is affected by any higher or lower rate which Riggs may have been paying on particular accounts.[37] These issues have not been argued to us or to the trial court in any detail, and we think it best to leave their initial resolution to the trial judge after the parties have had the opportunity to make appropriate submissions in the light of this opinion.

## VII

### CIVIL PENALTIES

The District requested the trial judge to impose substantial civil penalties against Riggs. The judge declined to do so, explaining without further elaboration that he agreed with Riggs' arguments regarding this issue. On appeal, the District contends that penalties should have been imposed. Although we find the pertinent statutory provision disconcertingly imprecise, we conclude that penalties are mandated by the statute and that further proceedings are required to determine their amount.

*A. The Statute and Legislative History.*

Section 42–235(a) reads as follows:

[a]ny person who fails to render any report or perform any other duty required under this chapter shall pay a civil penalty[38] of $100 for each day each report is withheld or each duty is not performed, but not more than $1,000 for each such violation.

---

**36.** For similar reasons, we are unable to agree with Riggs that the Council's failure in 1988 to act on a number of proposed amendments to the UPA, one of which would have imposed 18 percent interest per year on property not delivered when due, can properly be translated into the notion that pre-judgment interest may not be awarded under present law. Failure to act on proposed legislation is inconclusive evidence of legislative intent, especially when it is unexplained. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114–15, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Legislative inaction "might also have been due to the belief that the point was already covered by existing law." *Hotel Employers Ass'n v. Gorsuch*, 669 F.2d 1305, 1308 (9th Cir.1982).

**37.** The purpose of pre-judgment interest being to make the creditor whole, and no more, the District is obviously not entitled to a double recovery of both (1) statutory interest payable to the depositor on an account based on its value at the time it should have been delivered and (2) the interest actually paid by the bank during the period when the account should have been delivered but was not.

**38.** Section 42–236(a) provides that "[a]ll *fines* levied pursuant to § 42–235(a) are civil in nature." We presume that the two terms are used interchangeably in the UPA.

In discerning the meaning of Section 42–235(a), it is helpful to contrast it with Section 42–235(b), which provides that

> [a]ny person who willfully refuses to report, pay, or deliver abandoned property to the Mayor as required under this chapter shall be punished by a fine of not more than $300 or imprisonment for not more than 90 days ...

The legislative history of Section 42–235 is somewhat sparse. According to the Judiciary Committee, the National Conference of Commissioners on Uniform State Laws concluded, following its consideration of existing abandoned property legislation, that

> the construction of the penalty provisions was the major weakness of the entire act. Many holders of abandoned property worth hundreds of thousands of dollars failed to file and surrender such property, because the risk of not filing was so slight. As a result, the holder could use the property advantageously. Since the property is withheld for economical [sic] reasons, there should be economical [sic] sanctions imposed.

COMMITTEE REPORT, *supra*, at 35.

Three significant questions arise regarding the meaning of Section 42–235(a). The first is whether the imposition of penalties following a finding that the UPA has been violated is mandatory or permissive. The second concerns the operation of the $1,000 upper limit per violation in light of the prescribed penalty of $100 per day. The third and most difficult is whether the failure to report or deliver each individual official check or account constitutes a separate violation giving rise to a separate penalty, as the District contends, or whether, as Riggs maintains, $1,000 is the maximum penalty which may be imposed for failing to report or deliver all of the property collectively. We address each of these questions in turn.

### B. The Imposition of Penalties: Mandatory or Directory?

#### (1) General considerations.

■ The question whether a statutory provision is mandatory or directory is one of statutory construction. SUTHERLAND, *supra*, § 57.02, at 641. The conventional canons of construction apply, *id.* § 57.03, at 643, and we must therefore begin with a consideration of the statutory language.

The form of the verb used in a statute, *i.e.*, something "may," "shall," or "must" be done, is the single most important textual consideration in determining whether [that] statute is mandatory or directory. *Id.* Section 42–236 says "shall," a term which creates a duty, not an option. *Dupont Circle Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 530 A.2d 1163, 1170 (D.C.1987); *see also In re O.M.*, 565 A.2d 573, 582 (D.C.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1824, 108 L.Ed.2d 953 (1990). As the court stated in *Security Trust v. Smith*, 93 N.M. 35, 37, 596 P.2d 248, 250 (1979), the word "shall" in a statute is mandatory unless such a construction is "inconsistent with the manifest intent of the legislature or repugnant to the context of the statute." *Accord, Robinson v. Pleet*, 76 Md.App. 173, 179, 544 A.2d 1, 5, *cert. denied*, 313 Md. 689, 548 A.2d 128 (1988); SUTHERLAND, *supra*, § 57.03, at 643–44 & 647–48 n. 5.

We discern no "manifest intent" on the part of the Council to make discretionary the imposition of civil penalties which it said that violators "shall" pay. The legislative history does not specifically address the question, but the Judiciary Committee did emphasize the importance of an effective deterrent against refusals to report or deliver property subject to the Act. COMMITTEE REPORT, *supra*, at 35. The question whether the mandatory imposition of such penalties is "repugnant" to the statutory context is somewhat more troubling, but we conclude that there is no such repugnancy.

#### (2) The statutory context.

Unlike pre-judgment interest, which is remedial in character, civil penalties are supposed to be punitive. *See Meeker & Co. v. Lehigh Valley R.R. Co.*, 236 U.S. 412,

423, 35 S.Ct. 328, 332, 59 L.Ed. 644 (1915). As the Supreme Court of Illinois put it in *Hoffmann v. Clark*, 69 Ill.2d 402, 417, 14 Ill.Dec. 269, 282, 372 N.E.2d 74, 87 (1977).

> [a] penalty is in the nature of punishment for the nonperformance of an act or for the performance of an unlawful act. *It involves the idea of punishment.*

(Emphasis added; citation omitted). In the absence of contrary statutory intent, a civil penalty may be imposed only upon a showing of "culpable fault or omission." *Mannan v. District of Columbia Bd. of Medicine*, 558 A.2d 329, 335 (D.C.1989); *cf. Parker v. Stein*, 557 A.2d 1319, 1322 (D.C. 1989) (punitive damages).

Nothing in Section 42–235(a) requires any proof of bad faith or willfulness before civil penalties may be imposed. Section 42–235(b) authorizes criminal punishment only for willful violations, but there is no such restriction in the context of civil penalties. Even if Riggs acted in good faith, that is no defense. *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir.1976) *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977); *see also* 36 Am.Jur.2d *Forfeitures & Penalties* § 94 at 669–70 (1968). This result is somewhat troubling in a case such as this one, in which Riggs has made *bona fide* and reasonable contentions as to the reach of the UPA. Indeed, Riggs has prevailed on a number of the issues which it has raised. Under these circumstances, there is some basis in logic for Riggs' complaint that imposition of penalties would be unfair and would unreasonably chill the exercise of the right to litigate the meaning of a new statute and to advance reasonable contentions for the consideration of the court. One might therefore plausibly contend that the Council did not intend penalties to be mandatory for *bona fide* violators of the Act.

■ In general, however, the question whether a defendant acted in good faith or in bad faith goes to the size of the appropriate penalty rather than to the propriety of assessing *any* sanction. *See United States v. Papercraft Corp.*, 540 F.2d 131, 141 (3d Cir.1976); *Safir v. Klutznick*, 526 F.Supp. 921, 934 (D.D.C.1981). There is nothing novel about the imposition of civil penalties without any showing of willfulness, and Riggs has advanced no constitutional contention with respect to this issue.[39] Our duty as judges is "not to do justice but to apply the law and hope that justice is done." *Bifulco v. United States*, 447 U.S. 381, 402, 100 S.Ct. 2247, 2260, 65 L.Ed.2d 205 (1980) (Burger, C.J., concurring). We therefore conclude that the argument that the imposition of penalties should be viewed as discretionary rather than mandatory is more appropriately addressed to the legislature than to this court. There is no contextual repugnancy; we may not substitute subjective notions of fairness for explicit statutory language.

## C. The Prescribed Daily Fine and the $1,000 Maximum.

■ Section 42–235 provides that a violator shall pay a civil penalty of $100 for *each day* that each report is withheld or each duty is not performed. This suggests that if the violation continues for a hundred days, the amount of the penalty is $10,000. The statute also provides, however, that the maximum penalty is $1,000 for each violation. We think that this means that after a violation has continued for ten days, the penalty has peaked at $1,000, and no further sum may be imposed. That is the plain meaning of the statutory language.

This result is not without its problems. Suppose that Riggs refused to report abandoned property worth a million dollars. After ten days, Riggs would be subject to a penalty of $1,000. Thereafter Riggs would have no incentive, at least under the civil

---

**39.** As the court stated in *Department of Labor & Indus. v. Rosen*, 44 N.J.Super. 42, 49, 129 A.2d 588, 592 (1957),

> [t]he Legislature may make the commission or omission of an act penal regardless of intent, and in such case only the doing of the proscribed act need be shown.... The ab-

sence of such an intent to violate the law is not a defense, since the intent is not a necessary feature of the case, and is immaterial. (Citations and internal quotation marks omitted). "The criminal mind is not essential where the Legislature has so willed." *State v. Labato*, 7 N.J. 137, 149–50, 80 A.2d 617, 623 (1951).

penalty provision,[40] to report or deliver the property until its next reporting obligation the following year, no matter how willful the noncompliance during the remaining 355 days might have been. We are not at liberty, however, to rewrite the statute to incorporate any desirable flexibility.

### D. Defining the Violation.

The most difficult task of all regarding the operation of Section 42–235(a) is to identify the violation to which the $100 per day penalty attaches. If the District is right in its view that penalties arise on a "per item" basis, then Riggs might have to pay several million dollars. According to Riggs, there was only a single duty and it owes $1,000 at most. We are of the opinion that the interpretations of the statute offered by both parties lead to unacceptable and even absurd results. Unfortunately, we are not aware of any reasonable interpretation of the statute, consistent with its language, that will avoid the absurdity altogether.

Penal statutes must be strictly construed, see pages 1261–1262, *infra*, and we interpret Section 42–235 accordingly. The result we reach is closer to Riggs' position than to the District's, and we recognize that our construction may not adequately carry out the Council's deterrent purposes in enacting the provision for civil penalties. We view the District's interpretation, however, as even less acceptable and as irreconcilable with the statutory language and with applicable canons of construction. We regret that we are limited under this provision to what we view as a choice between fundamentally unsound alternatives, and think that legislative clarification would be the most effective resolution in the long term.

#### (1) The District's interpretation.

According to the District, brief at 46, [e]ach failure of a holder to deliver each item of property is a breach of a "duty" under the Act. *See* [42–235(a)]. The Act considers each deposit and each offi-cial check as an individual item of abandoned property. *See* [§§ 42–206(a)] ("any * * * deposit), [–206(b)] ("a sum payable on any * * * written instrument). It follows that failure to deliver each deposit and each sum is a separate violation of the Act. The maximum penalty available under [§ 42–235] in this case is therefore several million dollars, based on a $1000 penalty for each withheld account and check. On the one hand, that amount might be excessive in this case because of the large number of accounts and checks Riggs kept (but not in light of the magnitude of Riggs' violation of the Act). On the other hand, if Riggs were able to withhold abandoned property as freely as it did, knowing that it can profit from income generated by that property beyond the statutory interest rate of 6%, D.C.Code § 28–3302(a), it would have a powerful incentive to violate the Act.

The District's interpretation encounters textual difficulties. The opening words of the statute are "[a]ny person who fails to (1) render any report or (2) perform any other duty under this chapter" (parenthesized numerals added). The obligation to report is contained in Section 42–217, which contemplates a single report of all abandoned property held. The implementing Regulation provides that "a holder must annually file *a* verified report ... even if only to indicate that they [sic] have no reportable items ..." 9 DCMR § 3004.1 (1986) (emphasis added). It goes on to state that "[i]n general, each report shall contain the information required by [Section 42–217]." *Id.* at § 3004.4. Failure to render a report thus appears to be a one-time violation, at least until the next reporting obligation the following year.

The second potential trigger for liability for civil penalties is the failure to perform "any other duty required under this chapter." The duty to which this phrase alludes is one that is different from the duty to render a report. Since the obligation to "report" apparently relates to the report-

---

**40.** We have, of course, ruled that the District would be entitled to recover pre-judgment inter-est, so that defiance beyond the ten-day period would not be completely cost-free.

ing at one time of all that is reportable, and in light of the structure of the section as a whole, it is unlikely the parallel allusion to any other duty was designed to be construed as authorizing the imposition of penalties on a per item basis.

To make the point in a different way, suppose that a holder has 500 items to report and deliver. We think it makes little sense to rule that the failure to report them all is a single violation, but the failure to deliver them constitutes 500 violations, for a total of 501. There were either two violations or a thousand. In light of our construction of the duty to report as being a single one applying to all that is reportable at a given time, we interpret the phrase "any other duty" in a similar fashion. With respect to the duty to deliver, this approach is also consistent with Section 42–219, which requires the holder to deliver to the Mayor on a certain date all abandoned property specified in the report previously made pursuant to Section 42–217. Again, the statute apparently envisages a one-step act applicable to all that is deliverable.

Moreover, Section 42–235(b) provides for a fine of no more than $300, or imprisonment for not more than ninety days, for *willful* refusals to report, pay, or deliver abandoned property. Surprisingly, the maximum monetary fine for a willful refusal to perform a statutory obligation is $300, while the maximum civil penalty for what may be an innocent failure to do so is $1,000. We think it obvious, in context, that the punishments authorized by Section 42–235(b) refer to a one-time failure to report, pay or deliver all abandoned property in one's possession. If the criminal provision were item-based, so that a violator could receive a separate sentence of imprisonment for ninety days for each official check or deposit which he willfully refused to report, pay, or deliver, then an officer of Riggs could receive several hundred years in prison for failure to report all of the items disputed in this case. That surely is not what the Council intended. It is im-

probable that one violation of Section 42–235(b) for purposes of criminal prosecution could constitute many hundreds of violations when civil penalties are being assessed.

The practical consequences of the District's interpretation of the civil penalty provision are also startling. The District's audit of Riggs revealed that the bank had a total of 495 individual dormant accounts which it failed to deliver to the District in alleged violation of the UPA. Many of these accounts were very small; some were under ten dollars. In the absence of a clear statement of legislative intent, we will not ascribe to the Council the intention to make a failure to report for ten days or more an account having a value of five dollars—or even of fifty-five dollars [41]—the basis for subjecting the holder to a mandatory civil penalty of $1,000, irrespective of the holder's good faith.

(2) Riggs' interpretation.

Riggs' response to the District's interpretation of Section 42–235(a) is as follows:

> The District assumes that each "failure of a holder to deliver each item of property is a breach of 'duty' under the Act." Dist.Br. at 46. The concept of "duty," however, need not be so finely ground. Under a more reasonable view of it, a "duty" is violated when the abandoned property subject to a given report is withheld. The reporting requirement is set forth in D.C.Code § 42–217(a), and § 42–219(a) specifies that a reporting person "shall, within six months ... pay or deliver to the Mayor *all* abandoned property specified in the report." (Emphasis supplied). Accordingly, even if the District's claims in this case were valid, Riggs "failed to report and deliver" unclaimed property on only one occasion—in response to the District's demand letter of February 25, 1986.

Reply brief at 48 n. 46. We think that Riggs' argument is likewise flawed.

---

**41.** Section 42–217(b)(3), which deals with the contents of a holder's report to the District, provides with less than beguiling clarity that

"items of value under $50 shall be reported in the aggregate upon the aggregation exceeding $50."

The UPA does not impose a single duty upon holders to "report and deliver," nor does it say that there shall be a single penalty no matter how many violations they might commit. On the contrary, a variety of duties are described in the Act. Holders must, among other things, report abandoned property, § 42–217, and deliver it, § 42–219. They may not impose service charges unless certain conditions have been met. § 42–206(e). They must notify owners of apparently abandoned property of the presumption of abandonment. § 42–217(e). They are required to permit inspection of business records to determine whether they are in possession of property subject to the Act. § 42–230(b). Holders must also retain relevant business records for ten years after the date any property may have become reportable. § 42–232(a). Even if one rejects, as we do, the District's draconian contention that each innocent error about any single official check or deposit must cost the holder $1,000 if it is not corrected within ten days, a holder may be liable for several thousand dollars in penalties for failing to perform a number of different duties.

Recognition that there are various categories of duties under the Act disposes of Riggs' contention that it is subject, at most, to a penalty of $1,000. Even so, a construction of the statute which limits to $1,000 the civil penalty for failure to file one report of all of the holder's abandoned property also leads to results which may well be at odds with what the Council intended. First, a bank which is in possession of 1000 reportable items would pay the same penalty under this approach if it reported 999 of them as it would if it reported none. Second, penalties aggregating a few thousand dollars are unlikely to achieve the Council's stated purpose of making it uneconomical for holders not to comply with the requirements of the Act. The Council was surely "concerned with avoiding a situation in which the statutory penalty would be regarded by potential violators ... as nothing more than an acceptable cost of violation, rather than as a deterrence to violation." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 231, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975). "[T]o be an effective deterrent to violations, civil penalties should be large enough to hurt the offender." *State ex rel Brown v. Howard*, 3 Ohio App.3d 189, 191, 444 N.E.2d 469, 471 (1981). It is questionable whether Riggs' interpretation, or any construction based on the same general approach, can effectively vindicate this statutory purpose.[42]

(3) Applicable principles of construction.

We are thus confronted with a rather nebulous statutory provision which is subject to a number of possible interpretations, none of which provides results compatible with what we believe to have been the legislative purpose. Without presuming to second-guess the Council, we suggest that its goals would find readier vindication in a more flexible provision which would permit the court to consider such factors as good faith or lack thereof, the extent and gravity of the violation,[43] the financial condition of the defendant, and the degree to which he profited from his wrong. *See Howard, supra*, 3 Ohio App.3d at 191–92, 444 N.E.2d at 471–72; *cf.* J. STEIN, DAMAGES AND RECOVERY § 197, at 393–94 (1972 & 1989 Supp.) (dealing with punitive damages).

We have previously noted that Section 42–235(a), as written, is difficult to reconcile textually with the District's notion that

---

**42.** This is particularly true here since the statute, as written does not allow the court to take into consideration the violator's net worth. As one commentator has noted in connection with the related issue of punitive damages, "a verdict of $5,000 might very well have no effect at all as punishment when the defendant is a large insurance company or an international labor union. On the other hand, it might well be an excessive punishment when that amount is awarded against a laborer to whom it may represent the better part of a year's salary." J. STEIN, DAMAGES AND RECOVERY § 199, at 400 (1972 & 1989 Supp.).

**43.** *See, e.g.,* Section 34(c) of the 1981 Uniform Act, which provides that "[a] person who willfully fails to pay or deliver property to the administrator as required under the Act shall pay a civil penalty equal to 25 percent of the value of the property that should have been paid or delivered."

the failure to report or deliver each individual item represents a separate violation mandating a separate civil penalty. Assuming, *arguendo,* that this question is in doubt, our conclusion is reinforced by the canon of construction which we find decisive here in case of ambiguity.

"The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." *United States v. Wiltberger,* 5 Wheat. (18 U.S.) 76, 95, 5 L.Ed. 37 (1820) (per Marshall, C.J.). "Statutes imposing penalties will not be construed to include anything beyond their letter, even though it may be within their spirit." *County of Merrick v. Beck,* 205 Neb. 829, ——, 290 N.W.2d 642, 645 (1980); *see also United States v. Harris,* 177 U.S. 305, 309, 20 S.Ct. 609, 611, 44 L.Ed. 780 (1900). A court may not interpret a penal statute so as to increase the penalty which it authorizes when such an interpretation can be based on no more than a guess as to what the legislature intended. *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958); *see Dobbs v. Neverson,* 393 A.2d 147, 154 (D.C.1978).

The rule of strict construction "rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature." SUTHERLAND, *supra,* § 59.03, at 11. "[I]n case of doubt concerning the severity of the penalty prescribed by a statute, construction will favor a milder penalty over a harsher one." *Id.* at 12; *Government of Virgin Islands v. Douglas,* 812 F.2d 822, 833 (3d Cir.1987); *see also Bifulco, supra,* 447 U.S. at 387, 100 S.Ct. at 2252.

Although the rule of strict construction of penal statutes is most often invoked in the context of criminal prosecutions, it applies with equal force here. If there is some sanction in a statute to compel obedience beyond mere redress to an individual for injuries received, then the statute is at least to that extent penal. SUTHERLAND, *supra,* § 59.01, at 2. The inclusion of such sanctions does not necessarily make the entire statute penal in nature. *Id.* The UPA is quintessentially remedial to the extent that it puts an end to private escheats,

and we have construed it generously in regard to its substantive reach. See page 1234, *supra.* "[T]here is no legal obstacle to the remedial portions of a statute being construed liberally, and those that impose penalties or forfeitures being construed strictly." *Fisher v. Bethesda Discount Corp.,* 221 Md. 271, 276, 157 A.2d 265, 268 (1960); *see also Nuclear Corp. of America v. Hale,* 355 F.Supp. 193, 197 (N.D.Tex. 1973), and authorities there cited.

In *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), a prosecution under the Mann Act, the question presented was whether the simultaneous transportation of more than one woman across state lines for immoral purposes constituted one offense or several. The Supreme Court ruled that it was only one. Speaking through Justice Frankfurter, the Court explained that

> [w]hen Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity ... This in no wise implies that language used in criminal statutes should not be read with the saving grace of common sense with which other enactments, not cast in technical language, are to be read.... It merely means that if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses, when we have no more to go on than the present case furnishes.

*Id.* at 83–84, 75 S.Ct. at 622.

The foregoing language casts grave doubt upon the District's notion that every "stick in the faggot"—*i.e.,* every unreported abandoned official check and deposit—generates a separate civil penalty of up to $1,000. Selecting what we regard as the least of three evils, we hold that a failure to report property as required constitutes a

single violation for purposes of the civil penalty provision, and that every other duty imposed by the Act is subject to a similar analysis. On remand, the trial judge should therefore determine how many conceptually distinct duties under the statute Riggs breached, and should impose civil penalties accordingly.

## VIII

### CONCLUSION

We affirm the decision of the trial court with regard to the official checks and deposits which had been transferred to income on Riggs' books as of January 1, 1980. We reverse that part of the decision which requires Riggs to report and deliver property abandoned by persons whose last known addresses were in states with which the District has no reciprocity agreement. We also reverse that part of the decision which relates to service charges imposed by Riggs on dormant accounts and to the interest that the funds represented by such charges would have accrued. The trial judge shall award the District pre-judgment interest on such amounts as he holds on remand that the District is entitled to recover, and shall assess civil penalties against Riggs as described herein.

Accordingly, the judgment is affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*